PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.                                        No. 03-4428

WILLIAM HASKELL FARMER,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Cameron McGowan Currie, District Judge;
Dennis W. Shedd, District Judge.
(CR-00-385)

Argued: February 27, 2004

Decided: June 4, 2004

Before WIDENER, WILKINSON, and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Widener and Judge Gregory joined.

---

## COUNSEL

**ARGUED:** Clarence Rauch Wise, Greenwood, South Carolina, for Appellant. Eric William Ruschky, Assistant United States Attorney, Columbia, South Carolina, for Appellee. **ON BRIEF:** J. Strom Thurmond, Jr., United States Attorney, Columbia, South Carolina, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

In April 1998, the United States Customs Service learned of large-scale counterfeit clothing operation run by William H. Farmer, and it obtained a warrant to search Farmer's residence. Evidence at Farmer's home confirmed that Farmer was purchasing blank t-shirts and sweatshirts manufactured for companies like Nike and Hilfiger, placing those companies' logos on the shirts without authorization, and then passing along the shirts to the public as brand-name goods. Farmer pled guilty to charges of trafficking in counterfeit clothing and conspiracy to commit money laundering, conditioned on his right to bring this appeal. Farmer contends that the search warrant of his home was based on stale information, and that his indictment failed to allege any violation of the criminal trademark infringement statute. We find Farmer's claims without merit, and affirm his conviction.

I.

Many of the t-shirts and sweatshirts sold by sportswear companies like Adidas, Nike, or Reebok are actually produced by independent mills or factories. For instance, once Nike has designed a particular t-shirt, it may authorize one or more mills to produce the shirt based on Nike's specifications. Yet more than merely fabric, shape and color make the shirt recognizable as one of Nike's — a satin finish, "booklet fold" neck label and the famous Nike swoosh identify the shirt to consumers as belonging to the Nike brand. Nike thus supplies its authorized manufacturers with neck labels to be sewn into the collars during production, and then Nike's trademark is affixed to the shirt either at the original mill or at a separate facility.

Not all of the shirts produced by any mill end up in Nike's hands. For instance, some shirts will not meet Nike's specifications. The shirts that have manufacturing flaws are classified as "irregular" or "B-grade," and while Nike permits its mills to sell irregular shirts, the mills are required first to remove Nike's name or logo from all irregular garments. The purpose is to prevent clothing that Nike has already rejected as substandard from being associated with the Nike name. In addition to irregulars, mills may be left with apparel as a result of

overruns or cancelled orders, and the mills may also sell this apparel so long as they remove all names or logos.

Farmer attempted to take advantage of this system. He purchased millions of dollars worth of blank t-shirts and sweatshirts from various mills that were manufacturing apparel for Nike, Adidas, and Tommy Hilfiger. Farmer then hired companies to sew labels into the shirts, and either screen-print or embroider logos (mostly Nike's) on them. Finally, Farmer sold the shirts to Carolina Apparel Trading, Inc., an outfit that bought closeouts, overruns and irregulars from manufacturers and resold them to off-price retailers such as T.J. Maxx and Marshalls.

The Customs Service first learned of Farmer's operation from John Pierce and Ron Davis, who had been indicted for their involvement in an unrelated counterfeit clothing operation. On April 14 and 15, 1998, Pierce and Davis informed Customs Special Agent G. Bruce Pharis that in roughly four months — from January 2 through May 18, 1997 — they had sold Farmer more than a half-million dollars' worth of counterfeit clothing. Farmer paid Pierce and Davis either by cashier's check or by wiring money to their bank account, and his last payment to them was made on June 14, 1997.

According to Pierce and Davis, they usually delivered the merchandise to Farmer at a motel in Greenville, South Carolina, but on one occasion they delivered to a warehouse in Greenville. Agent Pharis subsequently identified the warehouse as belonging to Advance Direction, Inc. ("ADI"). In May 1998, as a result of discovery in civil litigation between Tommy Hilfiger and ADI, Agent Pharis learned that ADI had purchased counterfeit Tommy Hilfiger t-shirts from Farmer in the fall of 1996. Pharis then investigated the telephone number that Pierce and Davis had used to contact Farmer, and found that it was registered to 5 Hilander Court, Travelers Rest, South Carolina, which Pharis confirmed as Farmer's home address. According to telephone records for Farmer's residence, Farmer had called Ron Davis in October 1997. He had also made several phone calls in October 1997 to Heritage Embroidery, which was the company that embroidered Nike logos on t-shirts for Farmer.

Based on this information, Customs Service agents obtained a warrant in July 1998 to search Farmer's residence for evidence of traf-

ficking in counterfeit clothing. In addition to large sums of currency, agents seized customer copies of 258 cashier's checks. These included checks from Carolina Apparel Trading to Farmer, as well as checks from Farmer to Spring Ford Knitting, one of the mills from which Farmer purchased the blank t-shirts; Creative Apparel, the company that sewed the neck labels into the t-shirts; Dixie Screen Printing, the company that screen-printed logos on the t-shirts; and Heritage Embroidery. The agents also seized a lease for a warehouse at 1525 Cedar Lane in Greenville, as well as invoices from Spring Ford Knitting and Hubscher Ribbon, the company from which Farmer purchased neck labels. Farmer then consented to a search of the pickup truck and trailer parked in front of his house, where along with more invoices and cashier's checks, agents seized nearly six thousand t-shirts screen-printed with Nike's swoosh logo.

The agents subsequently obtained a search warrant for the Cedar Lane warehouse, where they seized approximately 3,500 shirts with Nike's logo; 9,700 shirts with Adidas's logo; 141,000 blank t-shirts, 122,000 of which had Nike neck labels; two punch guns used for attaching hang tags to garments; and roughly 20,000 bar codes. Searches of Creative Apparel, Dixie Screen-Printing, and Carolina Apparel Trading ensued with predictable results: agents obtained tens of thousands of t-shirts with Nike neck labels or logos, as well as various business records confirming dealings between Farmer and the companies.

On May 2, 2000, Farmer was charged before the United States District Court for the District of South Carolina with trafficking in counterfeit clothing, money laundering, conspiracy to commit counterfeit clothing trafficking and money laundering, and rescuing seized property. Farmer moved to quash the search warrant of his house, but the district court denied his motion. Farmer subsequently moved to dismiss the indictment against him, but this motion too was denied by the district court. Farmer's trial commenced on January 13, 2003, and after three days of testimony, the district court ruled that as a matter of law Farmer had failed to establish any affirmative defense. Farmer then entered a conditional plea of guilty to trafficking in counterfeit clothing and conspiracy to commit money laundering. On May 8, 2003, Farmer was sentenced to 84 months in prison, as well as restitution and forfeiture.

On appeal, Farmer contends that the district court erred when it failed to quash the search warrant of his home. He also argues that the district court should have dismissed the indictment against him. We address his claims in turn.

## II.

Farmer first asserts that the district court erred in failing to quash on grounds of staleness the July 1998 search warrant of his home, which was based on the affidavit of Special Agent Pharis. Farmer contends that the information contained in Pharis's affidavit — information gathered by Pharis during his interviews with John Pierce and Ron Davis — was too old to furnish probable cause for the search. Although Pierce and Davis had sold Farmer counterfeit clothing throughout the first half of 1997, Farmer's last payment to the pair was made on June 14, 1997. And the several phone calls from Farmer to Davis and Heritage Embroidery were made in October 1997, roughly nine months before the warrant issued. According to Farmer, nothing in Pharis's affidavit provided probable cause to believe that Farmer's counterfeiting had continued from October 1997 through July 1998.

The district court rightly rejected Farmer's staleness argument. As we have made clear, "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *United States v. Rhynes*, 196 F.3d 207, 234 (4th Cir. 1999) (quoting *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984)); *see also United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (staleness not measured "solely by counting the days on a calendar"). "Rather, we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *Rhynes*, 196 F.3d at 234 (quoting *McCall*, 740 F.2d at 1336).

Here, all of the circumstances pointed toward a finding of probable cause. Farmer was under investigation for trafficking in counterfeit clothing and money laundering — not "mere isolated violation[s]" of the law, but criminal activities of "a protracted and continuous nature." *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972).

The ongoing nature of Farmer's counterfeit clothing operation rendered the recency of the information in Pharis's affidavit less crucial, and "suggest[ed] that probable cause [was] not diminished solely by the passage of time." *McCall*, 740 F.2d at 1336; *see also Rhynes*, 196 F.3d at 234 (long-term drug trafficking and money laundering operation); *United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004) (long-term drug trafficking operation); *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997) (protracted gambling outfit); *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995) (continuous illegal possession of firearms); *United States v. Chapman*, 954 F.2d 1352, 1372-73 (7th Cir. 1992) (repeated robberies).

Not only was Farmer's large-scale counterfeiting operation unlikely to have been suddenly abandoned, but Pharis's affidavit attested that the operation had continued for quite some time. Pierce's and Davis's dealings with Farmer, and Farmer's phone calls to Davis and Heritage Embroidery, indicated that Farmer had been counterfeiting clothing from at least January to October 1997. Thus Pharis's affidavit confirmed in fact what the nature of Farmer's criminal scheme suggested in theory: Farmer was engaged in an extended course of illegal counterfeiting. *See, e.g.*, *United States v. Leasure*, 319 F.3d 1092, 1099 (9th Cir. 2003) (six months old information not stale, in part because narcotics operation was elaborate and ongoing); *United States v. Spry*, 190 F.3d 829, 836 (7th Cir. 1999) (nine months old information not stale given evidence of "ongoing continuous criminal activity") (internal quotation omitted). There was no reason for the Customs Service or the magistrate judge to believe that, between October 1997 and July 1998, Farmer's counterfeiting operation had ground to a halt, or evidence of Farmer's scheme had been moved or destroyed.

Finally, the nature of the property sought by the Customs Service also supported a finding of probable cause. The search warrant authorized Customs agents to look for "documents including . . . records of payment . . . bank statements, canceled checks, check registers, [and] all payment receipts . . . which constitute evidence, fruits and instruments of . . . trafficking in counterfeit goods." These are precisely the types of records that "are not ordinarily destroyed or moved about from one place to another." *Rhynes*, 196 F.3d at 234; *see also McCall*, 740 F.2d at 1336-37; *United States v. Lacy*, 119 F.3d 742,

745-46 (9th Cir. 1997) (ten months old information not stale because defendant unlikely to have disposed of pornographic materials); *United States v. Word*, 806 F.2d 658, 662 (6th Cir. 1986) (several months lapse did not render information stale where "documents sought were business records prepared and kept in the ordinary course of business"). And Farmer's home phone records gave the Customs agents reason to believe that the records were likely located at Farmer's residence. *See, e.g.*, *United States v. Fawole*, 785 F.2d 1141, 1146 (4th Cir. 1986).

To accept Farmer's staleness argument, we would have to suppose that a successful and profitable criminal enterprise simply faded away for no apparent reason. This would defy common sense. In light of the totality of the circumstances — the ongoing nature of Farmer's alleged criminal activity, Farmer's apparent counterfeiting through most of 1997, and the type of business documents sought by the Customs Service — there was clearly probable cause in July 1998 to believe that evidence of Farmer's counterfeit clothing operation would be located at his residence.

### III.

Farmer next contends that the district court should have dismissed the indictment against him, because the government failed to allege any violation of the federal criminal trademark infringement statute, 18 U.S.C. § 2320 (West 2003 & Supp. 2004). According to Farmer, he affixed trademarked logos (like Nike's swoosh and Tommy Hilfiger's flag) only to shirts that had been manufactured for the respective trademark holders. Granted, it was Farmer rather than the trademark holders who oversaw the construction of the shirts, but the end result, Farmer asserts, was that consumers received shirts no different from those actually peddled by Nike or Tommy Hilfiger. Because he did not confuse consumers about the source of his goods, Farmer argues, his unauthorized placement of the trademarked logos did not constitute criminal trademark infringement.

Farmer's argument, however, runs headlong into a number of difficulties. Perhaps most importantly, the government continues to maintain that Farmer was not offering genuine brand-name shirts at all. According to the government, Farmer largely was purchasing "irregu-

lars" — shirts manufactured for, but rejected as defective by, Nike and Tommy Hilfiger. On the government's view, the entire point of Farmer's counterfeiting operation was to deceive consumers, to trick them into purchasing as Nike or Hilfiger clothing the very shirts those companies had already rejected as of lesser quality.

18 U.S.C. § 2320(a) subjects to criminal sanctions any person who "intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services." Farmer, of course, claims that he was not using a "counterfeit" mark, since he was selling shirts identical to those sold by authorized Nike and Hilfiger retailers. But the district court, in considering whether the indictment validly charged an offense of 18 U.S.C. § 2320, was required to accept the government's factual allegations as true. *See, e.g.*, *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Segal*, 299 F. Supp. 2d 840, 844 (N.D. Ill. 2004). The district court therefore properly declined to dismiss the indictment against Farmer, in light of the factual question as to whether Farmer's shirts were comparable in quality to those sold by Nike and Hilfiger.

Yet even were we to assume that none of Farmer's shirts were irregulars, it is undisputed that Farmer affixed trademarked logos to the shirts according to his own quality control standards — not Nike's and Hilfiger's.[1] One of the rights that a trademark confers upon its owner is "the right to control the quality of the goods manufactured and sold" under that trademark. *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) (citing *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986)). "For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *El Greco*, 806 F.2d at 395; *see also Shell Oil*, 928 F.2d at 107 (quoting *El Greco*); *cf.* Restatement (Third) of Unfair Competition § 24 cmt. c (1995).

---

[1]This is not a case where goods that had already been marked by the trademark holder were merely being repackaged, such that consumers could be sure of the goods' quality and source. *See United States v. Hanafy*, 302 F.3d 485, 486 (5th Cir. 2002).

It is easy to see as a practical matter why trademark holders like Nike and Hilfiger are accorded the right to control the quality of their goods: Farmer's shirts were almost certainly of inferior quality. Indeed, the government even presented evidence that Farmer had shoddily screen-printed and embroidered Nike's and Hilfiger's logos. Regardless, it is no defense for Farmer to claim that his shirts were of the same quality as shirts assembled under Nike's or Hilfiger's control: the whole point is that deciding whether shirts pass muster is reserved to Nike and Hilfiger, not to Farmer. In denying Farmer's motion to dismiss his indictment, the district court correctly concluded that Farmer could be held criminally liable for infringing on Nike's and Hilfiger's right to control the quality of goods sold under their trademarks.[2]

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

[2]Farmer also asserted two affirmative defenses, abandonment and misrepresentation, that he claims should have been submitted to the jury. The district court ruled after a three-day trial that Farmer had not presented sufficient evidence to warrant a jury charge on either defense. Having reviewed the record, we agree with the district court: Farmer failed to adduce evidence that Nike and Hilfiger had abandoned their trademarks or materially misrepresented the source of their goods.