**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-4877

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DONALD HANTON,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Orangeburg. Margaret B. Seymour, District Judge. (CR-03-402)

Submitted: June 13, 2006                    Decided: July 12, 2006

Before KING, GREGORY, and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

John A. O'Leary, Columbia, South Carolina, for Appellant. Jonathan S. Gasser, United States Attorney, Jane B. Taylor, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Donald Hanton appeals from his convictions in the District of South Carolina for a controlled substance conspiracy and a separate money laundering conspiracy. On appeal, he contends that the district court erred in denying his motion to suppress on, inter alia, the following grounds: (1) the search warrant authorizing the search of his residence was not supported by probable cause; (2) the firearms seized during the search were outside the scope of the warrant; and (3) his statements to federal agents were obtained in violation of his Fifth Amendment rights. As explained below, we reject these contentions and affirm.

I.

During an investigation into a potential cocaine trafficking conspiracy, federal agents uncovered evidence implicating Hanton in drug trafficking and money laundering activity. Relying on that evidence, the agents sought and obtained a search warrant for 114 Elijah Lane, Dorchester, South Carolina. The affidavit supporting the search warrant indicated that Hanton resided at 114 Elijah Lane with his girlfriend, Teresa Wilson.[1] The affidavit specified that Hanton had received sentences of two, four, and ten years for prior

_____

[1] According to the search warrant affidavit, Hanton listed 114 Elijah Lane as his residence on various loan applications, W-2 forms, and records of vehicle purchases.

2

convictions, and it contained information regarding Hanton's potential drug trafficking and money laundering activities.

The drug trafficking information came from the statements of three incarcerated inmates who asserted that Hanton sold them cocaine and crack cocaine between 1996 and 1999. The information concerning money laundering included various financial transactions, employment records, and tax returns. According to the affidavit, Hanton and Wilson leased or purchased five vehicles between 1998 and 2001 for a total price of $81,211, including cash down payments totaling $22,875. Although Hanton paid for several of these vehicles, at least four of them were registered in Wilson's name. Hanton, meanwhile, filed no tax returns between 1996 and 2000, and reported only $13,021 in income for 2001. During this time, Wilson claimed an annual salary of $18,000.

On January 23, 2003, the magistrate judge issued a search warrant for 114 Elijah Lane. Although agents requested that the warrant authorize a search for evidence of both money laundering and drug trafficking, the magistrate judge found probable cause only that the residence would contain evidence of money laundering. Accordingly, the search warrant authorized the search and seizure of evidence of money laundering, but did not authorize the search and seizure of evidence of drug trafficking.

The facts relating to the execution of the search warrant and the motion to suppress are undisputed. Agents executed the search

warrant on January 27, 2003. When Hanton arrived home from work that day, agents Phil Ardis and Charles K. Cox approached him, explaining that they had a warrant to search the premises and that they wished to seek his assistance with their investigation.[2] They assured Hanton that he was not under arrest, and Hanton unlocked the door and let them in so that they could execute the warrant. Several agents searched the residence and seized, among other things, two handguns and ammunition. While the search was ongoing, agents Cox and Sean McMicking spoke with Hanton about cooperating and told him about the possibility of signing a proffer agreement. Under such an agreement, Hanton would be fully truthful about the criminal acts of himself and others, and he would submit to a polygraph examination. The Government, for its part, would not use his statements against him. The tone of the discussion was conversational, and no threats were made to prosecute Hanton for possessing the two handguns. Moreover, the agents never handcuffed Hanton or drew their firearms in his presence. Indeed, once the residence was secured, they told Hanton that he was free to leave.

At the conclusion of the search, Hanton agreed to enter into a proffer agreement. Accompanied by agent Cox, Hanton drove himself to the Drug Enforcement Agency ("DEA") office. Upon

---

[2]In approaching Hanton with the search warrant, the two agents were dressed in plainclothes and followed Hanton to the back of the residence to avoid the attention of other suspects in the investigation who lived nearby.

4

arrival, Cox presented Hanton with a proposed agreement and allowed Hanton to read it.  Because Hanton had not finished high school, Cox then read the proposed agreement to him and described it in layman's terms.  Hanton promptly signed the proffer agreement and proceeded to make statements implicating himself and others.

Hanton later refused to submit to a polygraph examination, thereby breaching the proffer agreement.  As a result, on June 9, 2004, the grand jury indicted him for three offenses:  conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine and 50 grams or more of "crack" cocaine, in violation of 21 U.S.C. § 846 (2000) (Count 1); being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count 2); and money laundering conspiracy, in violation of 18 U.S.C. §§ 1956(a)(1), 1957 (Count 3).

On September 2, 2004, Hanton moved to suppress the evidence seized pursuant to the search warrant and the statements he had made pursuant to the proffer agreement.  By his motion, Hanton contended that the warrant was not supported by probable cause and that the firearms seized were beyond its scope.  He further asserted that his statements were made involuntarily and without the benefit of Miranda warnings.  On November 29, 2004, the district court conducted a hearing on the motion to suppress, after which the court orally denied the motion.

5

On December 3, 2004, Hanton entered conditional pleas of guilty on Counts 1 and 3, pursuant to Fed. R. Crim. P. 11(a)(2), preserving his right to appeal the denial of his suppression motion. On August 26, 2005, the district court sentenced him to concurrent sentences of 240 months imprisonment on Count 1 and 240 months imprisonment on Count 3. Hanton has timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

In reviewing the denial of a suppression motion, we review a district court's factual findings for clear error and its legal conclusions de novo. See United States v. Johnson, 114 F.3d 435, 439 (4th Cir. 1997). And, in so doing, we give "great deference" to a magistrate judge's determination of probable cause for the issuance of a search warrant. See United States v. Wilhelm, 80 F.3d 116, 119 (4th Cir. 1996) (citing Illinois v. Gates, 462 U.S. 213, 236 (1983)).

## III.

Hanton makes three principal contentions on appeal, all of which relate to his motion to suppress: (1) the search warrant was not supported by probable cause; (2) the seized firearms were outside the scope of the search warrant; and (3) his statements under the proffer agreement were obtained in violation of his Fifth

Amendment rights.[3]  We assess each of these contentions in turn.

                              A.

Hanton first asserts that the search warrant was not supported by probable cause because the information on which it was based was stale, in that it related to events at least three years before the search warrant was sought and issued.  In assessing probable cause, a magistrate judge is obliged to determine "whether given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  On appeal, "[o]ur inquiry is directed to whether the magistrate judge had a substantial basis for his conclusion that probable cause existed."  United States v. Williams, 974 F.2d 480, 481 (4th Cir. 1992).

The facts spelled out in the challenged affidavit provided a substantial basis for the magistrate judge to determine that

_____

[3]Hanton also contends that, because agents failed to leave a correct copy of the search warrant at the residence, as mandated by Fed. R. Crim. P. 41(f), the evidence seized pursuant thereto must be suppressed.  Because he raises this issue for the first time on appeal, our review is for plain error only.  See United States v. Baldovinos, 434 F.3d 233, 239 (4th Cir. 2006).  As we observed in Simons, the failure to leave a correct copy of the warrant does not contravene the Fourth Amendment.  United States v. Simons, 206 F.3d 392, 403 (4th Cir. 2000).  Thus, in order to prevail on this issue, Hanton must show either (1) that the failure to leave a correct copy of the warrant at the premises was deliberate, or (2) that he was prejudiced by such failure.  See id.  Hanton, however, has not attempted to demonstrate either of these requirements, and the district court thus did not plainly err in denying relief on this contention.

7

probable cause existed. As discussed above, the affidavit indicated that Hanton had sold drugs at 114 Elijah Lane between 1996 to 1999. It further indicated that Hanton and Wilson leased or purchased five vehicles between 1998 and 2001, on which they spent sums of money that were grossly disproportionate to the their reported incomes for those years. Furthermore, although Hanton provided the cash down payments for some of the vehicles, four of them were placed in Wilson's name.

To be sure, the events identified in the affidavit occurred three years before the search warrant was issued. Nevertheless, "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." United States v. Farmer, 370 F.3d 435, 439 (4th Cir. 2004) (concluding that probable cause existed to search for evidence of money laundering even though events supporting search warrant had occurred nine months earlier). First, documentary evidence of money laundering "[is] not ordinarily destroyed or moved about from one place to another." Id. at 440. Second, money laundering offenses are not "mere isolated violation[s]," but are crimes of "a protracted and continuous nature." Id. at 439. Given the specific information contained in the affidavit and the nature of the money laundering activities spelled out therein, the magistrate judge had a substantial basis for determining that there was a fair probability

that evidence of money laundering would be found at 114 Elijah Lane.

B.

Hanton next contends that the seized firearms should have been suppressed by the district court because they were outside the scope of the search warrant. A search warrant must "particularly describe" items to be seized. United States v. Legg, 18 F.3d 240, 242 (4th Cir. 1994). The search warrant for 114 Elijah Lane authorized seizure of documentary evidence of money laundering; it did not specify firearms. Thus, the firearms must be suppressed unless their seizure falls within some recognized exception to the warrant requirement. Id.

The district court concluded that the seizure of the firearms fell within the plain view exception to the warrant requirement. Under the plain view doctrine, a warrantless search is authorized when "(1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir. 1997). On this point, Hanton contends only that the incriminating character of the firearms was not "immediately apparent" to the searching officers because the residence searched and the firearms seized were owned by Wilson, not Hanton, and

9

because the agents and officers were not individually aware that Hanton was a convicted felon.

In order to justify a plain view seizure, however, it need not be immediately apparent to each involved officer that the items seized are incriminating; "it is sufficient that the agents collectively [have] probable cause to believe the weapon [is] evidence of a crime at the time of the seizure." United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996) (emphasis added). Importantly, the affidavit supporting the search warrant specified that Hanton resided at 114 Elijah Lane. The officers were thus justified in believing that he possessed any firearms found therein, regardless of who actually owned the residence or the firearms. And the affidavit specified that he was a three-time convicted felon, which was more than sufficient to provide probable cause that the firearms were evidence that he was a felon in possession of firearms, in contravention of 18 U.S.C. § 922(g)(1). See Wells, 98 F.3d at 810. The incriminating nature of the firearms was thus immediately apparent, and their seizure was appropriate under the plain view doctrine.

## C.

Hanton next contends that his statements made pursuant to the proffer agreement should have been suppressed because (1) the statements were made while he was in custody and without the

10

benefit of <u>Miranda</u> warnings, and (2) the statements were not made, and the proffer agreement was not signed, voluntarily.[4]

1.

Hanton first asserts that the statements were made while he was subject to a "custodial interrogation" and entitled to <u>Miranda</u> warnings. <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). Where, as here, there is no formal arrest, "[a]n individual is in custody for <u>Miranda</u> purposes when, under the totality of the circumstances, a suspect's freedom of action is curtailed to a degree associated with formal arrest." <u>United States v. Parker</u>, 262 F.3d 415, 419 (4th Cir. 2001) (internal quotation marks omitted).

The evidence shows that Hanton was not in custody. Hanton let the agents into the residence with his own keys, the agents did not handcuff him or draw their weapons in his presence, and they told him that he was free to leave.[5] <u>See</u> <u>id.</u> at 419 (concluding that

---

[4]Hanton further contends that the statements he seeks to suppress were obtained in contravention of his Sixth Amendment right to counsel. These statements, however, were made before any "initiation of adversary judicial proceedings" against him. <u>United States v. Alvarado</u>, 440 F.3d 191, 199-200 (4th Cir. 2006) (observing that "the Sixth Amendment applies to 'criminal <u>prosecutions</u>' as opposed to criminal <u>investigations</u>"). Indeed, he had not even been arrested. Accordingly, Hanton's right to counsel had not attached when he made the challenged statements, and the statements were thus not obtained in contravention of the Sixth Amendment.

[5]Hanton takes out of context a statement made by Cox during a detention hearing where Cox answered "Yes" to the question, "Did y'all let him know that he wasn't free to leave?" Agent Cox later

11

defendant was not in custody where she was told she was not under arrest; she was never handcuffed, restrained, or told that she could not leave; she was in her own home and was not forced to enter the room where the statements were made; and agents did not draw weapons in her presence). The conversations between Hanton and the agents were not threatening in tone, and Hanton voluntarily drove himself to the DEA office, where the challenged statements were made. See United States v. Uzenski, 434 F.3d 690, 704-05 (4th Cir. 2006) (concluding that defendant was not in custody where tone of discussion was not threatening, he came to the office to be interviewed voluntarily, and he was not forcibly restrained or told that he was under arrest). Put simply, Hanton was not in custody.

## 2.

Next, Hanton asserts that the statements should be suppressed because he did not enter into the proffer agreement or make his statements voluntarily. See United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (observing that the Due Process Clause requires the suppression of statements made where "the defendant's will has been overborne or his capacity for self-determination

---

clarified, in the same detention hearing, "I mispoke the first time. We originally executed the search warrant, he was not free to leave when we first got there, because for officer safety we have to secure the scene prior to letting anyone go. Once the scene was secured and he had no weapons on him, he was free to leave." Viewed in context, the statement of Cox on which Hanton relies does not demonstrate that he was in custody when he made the challenged statements.

12

critically impaired" (internal quotation marks omitted)). Hanton contends that the absence of defense counsel, the existence of armed agents, and the implied threat to prosecute for the illegal possession of firearms were sufficiently coercive that he signed the agreement and made his statements involuntarily. As we explained in Braxton, however, "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." Id. Even assuming the agents had advised Hanton that he could be prosecuted for possession of firearms, "[t]ruthful statements about [his] predicament are not the type of 'coercion' that threatens to render a statement involuntary." Id. at 782. The undisputed evidence reflects an absence of any factors that would have critically impaired Hanton's capacity for self-determination. The agents advised Hanton that he was free to leave, they discussed the details of the proffer agreement with him, and he then agreed to sign it and make his challenged statements. The evidence thus fails to support Hanton's contention that he signed the agreement and made the statements involuntarily, and the district court did not err in denying his motion to suppress the statements.

IV.

Pursuant to the foregoing, we reject Hanton's contentions of error and affirm his convictions.  We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before us and argument would not aid in the decisional process.

<u>AFFIRMED</u>