COURT OF APPEALS OF VIRGINIA

Present:    Judges AtLee, Athey and Bernhard
Argued by videoconference

JOSEPH TYRONE WOMACK

                                                        MEMORANDUM OPINION[*] BY
v.        Record No. 0642-25-3                 JUDGE CLIFFORD L. ATHEY, JR.
                                                            MARCH 24, 2026
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
James J. Reynolds, Judge

James C. Martin (Martin & Martin Law Firm, on briefs), for
appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,[1]
Attorney General, on brief), for appellee.

Following a bench trial, the Circuit Court of the City of Danville ("trial court") convicted

Joseph Tyrone Womack ("Womack") of possessing a schedule I or II controlled substance with

intent to distribute, second offense, and of possessing more than one ounce, but less than five

pounds, of marijuana with intent to distribute.  On appeal, Womack assigns error to the trial court

for denying his motion to suppress.  Womack also assigns error to the trial court for finding the

evidence sufficient to convict him of both offenses.  Finally, Womack assigns error to the trial court

for refusing to admit in evidence certain search warrants and accompanying affidavits during his

sentencing hearing.  For the following reasons, we affirm the judgment of the trial court.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

UNPUBLISHED

# I. BACKGROUND[2]

On March 21, 2024, law enforcement executed a warrant to search "The Drop Box," a restaurant located in Danville, Virginia.[3] As a result of the search, law enforcement seized over 1,000 grams of marijuana and over 60 grams of cocaine. Womack was subsequently indicted for possessing a schedule I or II controlled substance with intent to distribute, second offense, in violation of Code § 18.2-248(C), and possessing more than one ounce, but less than five pounds, of marijuana with intent to distribute in violation of Code § 18.2-248.1(a)(2).

Before trial, Womack moved to suppress the evidence seized during the execution of the search warrants. He alleged, in relevant part, that the affidavits submitted in support of the search warrants failed to establish probable cause. At a pre-trial hearing on the motion, the Commonwealth introduced the search warrants and affidavits in evidence. The first search warrant ("Warrant 1") was obtained on March 12, 2024. Warrant 1 authorized the police to search the Drop Box, its curtilage, and "any vehicle found on the property which Joseph Tyrone Womack has access to or control of." The second search warrant ("Warrant 2") was obtained on March 19, 2024. Warrant 2 authorized the police to search Womack's person and a "Dark Color Cadillac commonly operated by [him]." A third warrant was obtained on March 22, 2024, for Womack's "DNA and/or Biological Evidence" ("Warrant 3").

Both Warrants 1 and 2 described the property and objects sought, including:

> [n]arcotics, narcotics packaging materials, narcotics paraphernalia, firearms, firearm accessories, firearm documentation, ammunition, U.S. Currency (real or counterfeit), business records and/or sales

---

[2] "In accordance with familiar principles of appellate review, the facts [are] stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Aponte v. Commonwealth*, 68 Va. App. 146, 151 (2017) (alteration in original) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).

[3] Although various spellings of the restaurant appear in the record, including the "Drop Boxx" and the "Drop Boxx Southern Grille," Womack mainly uses the "Drop Box" on brief, and so will we.

documentation, electronic communication devices to include the application and/or data content therein as it pertains to the crimes set forth in section 1 of the Affidavit.[4]

An affidavit, attested to by Investigator Jonathan Motley ("Investigator Motley") of the Danville Police Department, was attached to Warrants 1 and 2. In the affidavit attached to Warrant 1, Investigator Motley averred that in 2020, the Danville Police Department began receiving tips that an individual named "Flow," who owned the Drop Box, was distributing controlled substances from the premises. Investigator Motley confirmed that Womack's "street name" was "Flow." In further support, Investigator Motley noted that on December 30, 2020, an FBI officer "received an anonymous letter" indicating that Womack "was trafficking large amounts of cocaine in the Danville, Virginia area." The letter further alleged that Womack had purchased the Drop Box with the "proceeds from his distribution." Additionally, on October 4, 2021, officers learned from "a cooperating source in reference to a cold case homicide" that Womack was distributing narcotics while residing at the Drop Box.

When drafting the affidavit, Investigator Motley also relied on information obtained from several confidential informants. For example, the affidavit stated that on April 27, 2022, a confidential informant advised that Womack was "selling large amounts of cocaine" from the Drop Box and "ha[d] firearms inside the business." Then, in May of 2022, another confidential informant advised that Womack was a methamphetamine supplier to a named individual. Similarly, in February of 2023, another confidential informant identified Womack as "the source of supply" for another named individual. On November 1, 2023, yet another confidential informant identified Womack as the owner of the Drop Box and "a distributor of cocaine base and cocaine." That

---

[4] There were only non-substantive differences between the descriptions of the property and objects to be seized in each warrant; the capitalization of words differs, and "crimes" is singular in Warrant 2. Section 1 of the affidavits alleged violations of Code §§ 18.2-248, -308.2, and -308.4.

particular source further alleged that Womack had been "a kilogram level cocaine distributor" in prior years.

The affidavit also provided that on November 1, 2023, police received a tip from an anonymous individual that "narcotics distributing activities were occurring at the EZ Stop Market," which Investigator Motley explained at the suppression hearing was located across the street from the Drop Box. The affidavit further explained that on that same day, officers also conducted "covert surveillance" of individuals coming to and going from the Drop Box. During the surveillance, officers observed an individual matching the description of Womack "walk what appeared to be a plate of food across the street and return to the Drop Box[] with the same plate of food." An unidentified male, who appeared to work at the restaurant, was also observed "conducting what appeared to be a 'hand to hand' in front of the restaurant" and "meeting with an unknown person" operating a vehicle.

Investigator Motley also noted in the affidavit that a reliable confidential informant advised him "[o]n or about" March 4, 2024, that "within the previous two . . . weeks of that date, they knew [Womack] to be distributing large quantities of cocaine from 'The Drop Box.'" After reviewing information from the Virginia State Corporation Commission, Investigator Motley confirmed that Womack was "listed as the registered agent for the Drop Boxx Southern Grille LLC," which was an LLC located at the same address as the restaurant. In addition, the affidavit stated that Womack had prior felony convictions from 2010 and 2023 for "[e]luding [l]aw [e]nforcement" and from 2007 for "[m]anufacturing a [c]ontrolled [s]ubstance"—as well as recent charges for being a felon in possession of a firearm and discharging a firearm in a public place that were subsequently nolle prossed. The affidavit further explained:

> Your affiant is aware based on training and experience that those who participate in the act of illegal narcotics distribution often keep firearms on or near their person as a means of protection or intimidation during, before and after the act of distribution. Your

affiant is also aware that distributors of controlled substances often utilize electronic means to communicate with potential purchasers or sellers of control schedule narcotics and that evidence of such communications is often retained withing [sic] the application or data content of said devices. . . .

Concluding the affidavit, Investigator Motley emphasized the "regular and ongoing nature of the complaint."[5]

A second affidavit attached to Warrants 1 and 2 explained that each confidential informant had been, according to Investigator Motley, "proven reliable through the provision of narcotic and firearm related information which could be verified by law enforcement on multiple occasions."

At the close of the hearing, Womack argued that "a number of the things that are contained . . . in th[e] search warrant are dated and is not probative of any continuing activity that could possibly be going on." In response, the Commonwealth argued that the information dealt with "the same subject at the same location" and that the information from 2022 and 2023 "[h]elp[ed] verify the credibility of the last person, which is the most recent." Womack, in turn, contended that "the majority of the evidence that was alleged in th[e] affidavit was stale" and that the only information that "arguably could be considered not stale was the information obtained by [Investigator] Motley on" March 4, 2024.

The trial court noted "some legitimate concern about whether or not the information might be stale based on some of the information being . . . over three years old." But the court also stated that "the magistrate could accept that information as the [C]ommonwealth has argued." Moreover, the court added that officers verified that Womack was frequently present at the Drop Box, that his

---

[5] Slight alterations were made to the affidavit attached to Warrant 2. For example, that affidavit also mentioned that Womack "ha[d] been observed operating a dark color Cadillac sedan," listed the license-plate number for the vehicle, and noted that "th[e] vehicle can be observed on a daily basis parked at [the Drop Box] during business and non-business hours." The affidavit attached to Warrant 2 also omitted the concluding remarks included in the affidavit attached to Warrant 1.

vehicle was present there, and that suspicious activity was observed. The trial court denied the motion to suppress, and the case proceeded to a bench trial.

At trial, the Commonwealth introduced in evidence Womack's 2007 conviction for possession of cocaine with intent to distribute. Investigator Motley also testified that on March 21, 2024, while surveilling the Drop Box, he saw Womack drive a black Cadillac out of the Drop Box parking lot. Officers subsequently stopped the vehicle and identified Womack and Larry Griffin ("Griffin") as the occupants of the black Cadillac. Officer Dalton of the Danville Police Department then testified that during the stop, he observed Womack attempting to pass a black plastic key to a passenger, later identified as Griffin. After taking the key, inspecting it, and returning it to Griffin, Officer Dalton relayed his observation to Investigator Motley, who then retrieved the key. Investigator Motley further testified that he asked Womack where the keys to the Drop Box were located and Womack indicated that they were in the center console of the vehicle. Upon searching the console, Investigator Motley observed "a box of ammunition" but no keys. After asking Womack a second time, Womack produced the keys from his right jacket pocket.

Officers then gained entry into the Drop Box using the keys Womack had on his person. Using the black plastic key, officers also opened "each individual paper towel and toilet paper dispenser within the business." As a result, "a brown paper bag, which contained two separate plastic bags, both containing . . . suspected crack cocaine," was located within a paper towel dispenser located in "a room directly behind the kitchen."

Special Agent Christopher Birch ("Special Agent Birch") with the ATF also assisted with the search of the Drop Box. He testified that a suitcase containing what appeared to be marijuana was located "in the kitchen area near the cash register." He also identified an item with "white powder residue on it" "[i]n the bathroom area, toward the back of the business." Investigator Motley confirmed that "approximately 1,358 grams of suspected marijuana" was located inside the

suitcase. Regarding the recovered item with white residue on it, Investigator Motley testified that it was "a digital scale, which was located in the bathroom, which was located off of the back office." Additionally, Investigator Motley testified that a "clear plastic bag" in plain view containing "approximately 185 grams of suspected marijuana" was seized "from the office desk in the back office."

A certificate of analysis produced by the Department of Forensic Science and introduced in evidence confirmed that approximately 1,308.52 grams (or approximately 46.16 ounces) of marijuana was seized from the suitcase; approximately 54.86 grams of "solid material" containing cocaine and 10.84 grams of "solid material including innermost packaging" containing cocaine was seized from the brown bag; and approximately 180.80 grams (or approximately 6.38 ounces) of marijuana was seized from the office desk.

Investigator Motley also testified that two cell phones were recovered during the search of the Drop Box. On the first phone, Investigator Motley discovered a photo of Womack holding a child. Messages on the phone also indicated that the user of the phone went by "Flo," and Investigator Motley testified that Womack went "by the street name Flow." Investigator Motley explained that incoming text messages on the phone showed that individuals were contacting Flo for grams of narcotics. In October of 2023, one person requested "a little half or g," and Flo responded, "Ez in ten minutes. Pull by casino." Another person requested "a gram" in December of 2023. On March 2, 2024, someone requested "a half g" but noted they had "a bottle of tequila," to which Flo replied, "Well you better enjoy that dawg."

The second phone recovered from the Drop Box contained messages from a person named "Iceplannt" requesting narcotics in monetary increments. For example, in February of 2024, Iceplannt texted the second phone, "50 something with a kick please better" and "I like a 40," which Investigator Motley explained meant that Iceplannt was requesting $50 and $40 of narcotics,

respectively. On March 15, 2024, Iceplannt texted, "Came u get me some of the same g shit for 6," and then texted, "Need a 40 at Walmart." Again, Investigator Motley testified that Iceplannt was requesting $40 of narcotics.

Investigator Motley also seized a DVR containing video surveillance footage of the interior and exterior of the Drop Box. Investigator Motley explained that a still image of the video surveillance footage admitted in evidence depicted Womack on March 20, 2024, holding the suitcase in which the marijuana was found. Another still image depicted Womack on that day holding a clear plastic baggie containing a "green plant material" consistent with the baggies of marijuana located in the suitcase. Another still image developed from the video footage dated March 7, 2024, depicted an individual wearing the same shirt that Womack was wearing in the March 20, 2024 still image and "multiple cell phones located on the counter in front of that individual." Another still image depicted Womack on March 7, 2024, standing next to a black Cadillac "pinching a bag containing white substance between his phone and his thumb," and yet another still image showed Womack that day in the Drop Box office "hiding a clear plastic baggie . . . containing white substance behind something on the desk." Finally, another still image from the video surveillance footage showed Womack at a table in the restaurant with "an open bag of what appears to be green plant material" on March 12, 2024. Investigator Motley testified that in "the actual video" from that date, Womack was "being visited by a person and weighing out the plant material and then packaging it in a separate bag."

Next, Investigator Lancaster, a member of the Danville Police Department's "special investigations section, vice narcotics unit," testified as "an expert in the field of narcotics distribution, specifically cocaine and marijuana." He opined that "based on [his] training and experience," the amount of cocaine and marijuana located at the Drop Box was inconsistent with

personal use. He further opined that the street value of the cocaine seized was $6,400, and the street value of the marijuana was approximately $14,800.

During closing argument, Womack conceded that the phone containing a picture of himself "could be attributable to [him]" but contended that the evidence was "insufficient to prove that he was the person operating th[e] [second] phone." He also disputed Investigator Motley's interpretation of the still images derived from the video surveillance footage depicting Womack. In sum, counsel for Womack contended that "under the totality of the circumstances, the evidence is insufficient to prove the[] charges."

Following closing statements, the trial court "f[ound] [Womack] not guilty of" maintaining a common nuisance and possession of ammunition by a convicted felon. The trial court then found Womack guilty of possession of a schedule I or II controlled substance with intent to distribute and possession of more than one ounce, but less than five pounds, of marijuana with intent to distribute. At sentencing, Womack requested that the trial court take judicial notice of "search warrants served at other locations" and listed the locations where the search warrants were served. Womack indicated that he sought to have the other "search warrants included as part of the record in this case" because in the event of an appeal, they would be "beneficial . . . to show the lack of veracity, perhaps, in the affidavit for the search warrants." The court denied Womack's request, reasoning that 1) it could not take judicial notice of the search warrants, and 2) it did not view "negative evidence" as admissible. After reviewing the evidence introduced and arguments made during the sentencing hearing, the trial court sentenced Womack to 35 years of incarceration, with 25 years suspended. Womack appealed.

## II. ANALYSIS

### A. *Standard of Review*

Because "[a]ppellate review of a magistrate's probable cause determination is deferential in nature," *Boyd v. Commonwealth*, 12 Va. App. 179, 185 (1991), "a search warrant will be upheld if the evidence, viewed as a whole, provided the magistrate with a '"substantial basis"' for concluding that probable cause existed to issue the warrant," *Bay v. Commonwealth*, 60 Va. App. 520, 537 (2012) (quoting *Boyd*, 12 Va. App. at 185-86). In reviewing the sufficiency of the evidence to sustain a conviction, "[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it,'" and "[t]he only 'relevant question is . . . whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024) (alterations in original) (first quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017); and then quoting *Commonwealth v. Barney*, 302 Va. 84, 97 (2023)). And a trial court's evidentiary ruling is "reviewed for [an] abuse of discretion." *Tomlin v. Commonwealth*, 74 Va. App. 392, 409 (2022), *aff'd*, 302 Va. 356 (2023).

### B. *The trial court did not err by denying Womack's motion to suppress.*

On appeal, Womack contends that the trial court erred by denying his motion to suppress because "the search warrants leading to the evidence in question were based on stale and unreliable information which was insufficient for probable cause."[6] In support, he asserts that "[t]he evidence in the case at bar suggests a relatively short-term drug operation based largely on circumstantial evidence from suspicious text messages." Womack also avers that the "transient nature of the drug trade" contributed to the staleness of the information. We disagree.

---

[6] At oral argument, counsel for Womack indicated that he was not contesting, on the basis of staleness, whether there was probable cause to issue Warrant 3. Hence, we only address Womack's allegations of staleness as they pertain to Warrants 1 and 2.

"[P]robable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Bay*, 60 Va. App. at 537 (alteration in original) (quoting *United States v. Grubbs*, 547 U.S. 90, 95 (2006)). The concept of staleness recognizes that "[p]robable cause may be diminished by the passage of time between when the supporting facts occurred and when the police issue [an] affidavit." *Sowers v. Commonwealth*, 49 Va. App. 588, 601 (2007). Hence, a magistrate's "conclusion that probable cause does exist must be based upon facts reasonably related in time to the date of the issuance of the warrant." *Stovall v. Commonwealth*, 213 Va. 67, 70 (1972).

"Generally, 'there is no fixed standard or formula establishing a maximum allowable interval between the date of events recited in an affidavit and the date of a search warrant.'" *Anzualda v. Commonwealth*, 44 Va. App. 764, 776 (2005) (en banc) (quoting *Johnson v. Commonwealth*, 259 Va. 654, 671 (2000)). Indeed, "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *Id.* (quoting *Perez v. Commonwealth*, 25 Va. App. 137, 142 (1997)). Rather, in testing for staleness, we must ascertain "whether the facts alleged in the warrant provided probable cause to believe, at the time the search actually was conducted, that the search conducted pursuant to the warrant would lead to the discovery of evidence of criminal activity." *Id.* (quoting *Johnson*, 259 Va. at 671). In doing so, "we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *Id.* (quoting *Perez*, 25 Va. App. at 142).

Here, the facts attested to in the search-warrant affidavits describe a years-long drug distribution enterprise being conducted out of a restaurant in Danville, Virginia. As early as December of 2020, the Drop Box was identified as a narcotic distribution hub, and Womack was identified as the proprietor of the restaurant and a distributor of controlled substances. In October of

2021, police received information that Womack was distributing narcotics and residing at the restaurant. In the spring of 2022, one reliable source stated that Womack was "selling large amounts of cocaine" from the restaurant and storing firearms on the premises, and another reliable source identified Womack as a methamphetamine dealer. Reliable information was also received in February of 2023, indicating that Womack was continuing to serve as a narcotics distributor. In November of 2023, law enforcement received confirmation that Womack was still the owner of the Drop Box and was still selling large quantities of cocaine from the restaurant. That same day, officers from the Danville Police Department conducting surveillance of the premises witnessed Womack and an employee of the restaurant engaging in suspicious transactions with individuals outside of the restaurant.

Even if the most recent information provided in the affidavits was from November of 2023, it would not "necessarily compel a finding that [the] search warrant was not supported by probable cause." *Anzualda*, 44 Va. App. at 777 (indicating that six-month-old information is not "necessarily" stale). But that was not all of the information provided, because on March 4, 2024, a reliable source notified Investigator Motley that Womack was *still* distributing narcotics—indeed, "large quantities of cocaine"—from his restaurant within the two weeks prior to that date. This information, received 17 days prior to the execution of the search warrant, confirmed the existence of a long-running drug distribution enterprise that, without intervention, was likely to continue operating. *See United States v. Farmer*, 370 F.3d 435, 439-40 (4th Cir. 2004) (stating that it would "defy common sense" "that a successful and profitable criminal enterprise simply faded away for no apparent reason"); *see also United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness."); *United States v. Iiland*, 254 F.3d 1264, 1269 (10th Cir. 2001) (stating that "the passage of time between the suspected illegal

- 12 -

activities and issuance of the warrant diminishes in significance" when "the alleged drug activity was ongoing over a considerable period of time").

Hence, even accepting Womack's characterization of the drug *trade* as "transient," the information provided in the affidavit undermines the proposition that the drug *operation* at issue was as well. Womack's reliance on evidence adduced at trial—i.e., the text messages—to mitigate the temporal scale of the drug distribution enterprise is misplaced. "[W]hen deciding the question of probable cause, we consider only those sworn, written facts stated in the search warrant affidavit." *Adams v. Commonwealth*, 275 Va. 260, 270 (2008).[7] Thus, Womack's attempt to utilize the evidence adduced at trial to vitiate probable cause is unavailing. *See Commonwealth v. White*, 293 Va. 411, 414 n.2 (2017) ("[A]s an appellate basis for reversing a criminal conviction based on an erroneous pretrial ruling, evidence at trial becomes relevant only if the defendant renews his pretrial motion at trial.").

Contrary to Womack's assertions, and giving deference to the magistrate's probable cause determination, *see Boyd*, 12 Va. App. at 185, we are compelled to find that the totality of the evidence here established a substantial basis for the magistrate to conclude that there existed "a fair probability that contraband or evidence of a crime" would be discovered at the Drop Box, in Womack's vehicle, or on Womack's person. *Bay*, 60 Va. App. at 537 (quoting *Grubbs*, 547 U.S. at 95). Thus, we cannot find that the trial court erred by concluding that the information contained within the affidavits supporting the search warrant was not stale, and as a result, the trial court did not err by denying Womack's motion to suppress.

---

[7] While courts may also consider "information simultaneously presented to a magistrate by sworn oral testimony, or in supplemental affidavits," neither sworn oral testimony regarding the information simultaneously presented to the magistrate nor supplemental affidavits were presented in this case. *Adams*, 275 Va. at 270 (citation omitted).

C. *Womack's challenge to the sufficiency of the evidence is procedurally defaulted.*

Next, Womack contends that the trial court erred by finding the evidence sufficient to convict him of either offense. Although Womack concedes that "the text evidence is highly suspicious at a few points," he nevertheless claims that "even if the text evidence is accepted as sufficiently incriminating," he was not "tied to actual drugs," as "his connection to the Drop Box business—and thus to the drugs found there—was only presented in evidence by its being mentioned in an exhibit offered during the suppression hearing." Moreover, Womack contends that the evidence failed to prove "that he was indeed the person who was operating the phone during the texting in question."

However, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. A challenge to the sufficiency of the evidence raised during closing argument "will preserve a challenge to the sufficiency of the evidence in a bench trial." *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011). But "[o]n appeal, though taking the same general position as in the trial court, an appellant may not rely on reasons which could have been but were not raised for the benefit of the lower court." *Moison v. Commonwealth*, 302 Va. 417, 419 (2023) (quoting *W. Alexandria Props., Inc. v. First Va. Mortg. & Real Est. Inv. Tr.*, 221 Va. 134, 138 (1980)).

Here, Womack failed to contend that the evidence tying him to the Drop Box or the drugs found therein was "only presented in evidence . . . during the suppression hearing." Although he asserted that the evidence was insufficient to convict him of both offenses, Womack's argument below did not encompass the specific argument that he now raises for the first time on appeal. *See Moison*, 302 Va. at 419. Hence, we conclude that his current argument is waived pursuant to Rule 5A:18.

As for Womack's claims that the text messages were not "sufficiently incriminating" and that the Commonwealth failed to prove that "he was indeed the person who was operating the phone during the texting in question," we do find that he raised these issues below, but we also find that he failed to adequately develop any argument in support of his position on appeal. "Rule 5A:20(e) requires that an appellant's opening brief contain '[t]he principles of law, the argument, and the authorities relating to each question presented.' Unsupported assertions of error 'do not merit appellate consideration.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (alteration in original) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008), *aff'd in part, vacated in part*, 279 Va. 52 (2010)). "'[W]hen a party's "failure to strictly adhere to the requirements of Rule 5A:20(e)" is significant,' this Court may treat the question as waived." *Id.* (quoting *Parks v. Parks*, 52 Va. App. 663, 664 (2008)).

Hence, Womack's remaining assertions, which are conclusory and unsupported by citations to authority, do not merit appellate consideration. *See id.* In focusing on whether the text messages were "sufficiently incriminating" and whether the evidence established that he operated the phone, Womack fails to explain the significance of this particular piece of the evidence adduced at trial. And in doing so, Womack ignores the plethora of *other* direct and circumstantial evidence implicating him as having possessed cocaine and a certain quantity of marijuana with the intent to distribute same. *See Barney*, 302 Va. at 97-98 (describing the "totality-of-the-evidence" method by which an appellate court reviews both direct and circumstantial evidence to ascertain the sufficiency of the evidence (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017))). Moreover, the Commonwealth was not tasked with proving that Womack operated or even possessed a cell phone; the Commonwealth was required to prove that Womack possessed the drugs, actually or constructively, contemporaneously with the intent to distribute them. *See Jordan v. Commonwealth*, 273 Va. 639, 645-46 (2007) (possession); *Stanley v. Commonwealth*, 12 Va. App.

- 15 -

867, 869 (1991) (en banc) (intent to distribute).  Thus, because Womack's failure to comply with Rule 5A:20(e) is "significant," we find this argument waived as well.  *Bartley*, 67 Va. App. at 744 (quoting *Parks*, 52 Va. App. at 664).

D. *Womack's final assignment of error is waived.*

Womack's third and final assignment of error challenges the trial court's decision to preclude him from admitting evidence of "other search warrants and/or affidavits."  Verbatim, Womack argues:

> Evidence is generally admissible if it is relevant and its probative value outweighs any prejudicial effect. *Walker v. Commonwealth*, 258 Va. 54, 68, 515 S.E.2d 565, 573 (1999), *cert. denied*, 528 U.S. 1125 (2000).  Under Rule of Evidence 2:403 of the Rules of the Supreme Court of Virginia, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See also* [C. Friend &] K. Sinclair, *The Law of Evidence in Virginia* (8th ed. 2018), § 6-3, pp. 369 *et seq.*
>
> Here, the defense wished to admit other search warrants and/or affidavits on the issue of veracity.  Given the probative nature of this inquiry, it was error to refuse this line of inquiry entirely.

"Simply put, '[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.'" *Bartley*, 67 Va. App. at 746 (quoting *Sneed v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010)).  While Womack sets forth general principles of evidence and cites authorities, his ipse dixit that an inquiry into the veracity of "other search warrants and/or affidavits" would have been probative at his sentencing hearing represents a "skeletal argument," *Bartley*, 67 Va. App. at 746 (quoting *Sneed*, 301 S.W.3d at 615), and a "significant" failure to comply with Rule 5A:20(e), *Bartley*, 67 Va. App. at 744 (quoting *Parks*, 52 Va. App. at 664).  At sentencing, Womack's admitted justification for seeking to introduce the "other search warrants

and/or affidavits" was "to show the lack of veracity . . . in the affidavit for the search warrants" for purposes of appellate review—ostensibly not even for appellate review of the trial court's ruling at the sentencing hearing but for appellate review of the trial court's ruling on Womack's motion to suppress. We can assign no immediately apparent probative value to the introduction of the "other search warrants and/or affidavits" for this purpose at sentencing (or discern whether the inquiry was relevant at all), and we will not construct Womack's argument for him. *See id.* at 746. Hence, Womack's final assignment of error is waived. *See id.*

But even assuming that the inquiry would have been probative, Womack failed to proffer the contents of the "other search warrants and/or affidavits." While Womack identified the search warrants he sought to admit, "[i]t is well established that a party who wishes to challenge the trial court's exclusion of evidence on appeal must provide a proffer of that evidence that is adequate to permit this Court to determine whether the lower court erred." *Smith v. Commonwealth*, 72 Va. App. 523, 541 (2020). Womack's failure to proffer the contents of the "other search warrants and/or affidavits" is thus an additional bar that precludes us from considering his third and final assignment of error. *See id.*; *Commonwealth Transp. Comm'r v. Target Corp.*, 274 Va. 341, 347-48 (2007).

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*