**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-4486**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DAVID ALLEN UHRICH,

Defendant - Appellant.

**No. 05-4487**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

KELLY J. JOHNSTON,

Defendant - Appellant.

**No. 05-4490**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

FREDRIC D. LEFFLER,

Defendant - Appellant.

Appeals from the United States District Court for the District of Maryland, at Baltimore. André M. Davis, District Judge. (CR-03-10)

Argued: December 1, 2006                    Decided: June 1, 2007

Before WILKINS, Chief Judge, WILKINSON, Circuit Judge, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Norman L. Smith, FISHER & WINNER, Baltimore, Maryland; Richard Christopher Bittner, Glen Burnie, Maryland; Andrew Radding, ADELBERG, RUDOW, DORF & HENDLER, L.L.C., Baltimore, Maryland, for Appellants. Joyce Kallam McDonald, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Gregory M. Kline, ADELBERG, RUDOW, DORF & HENDLER, L.L.C., Baltimore, Maryland, for Appellant Kelly J. Johnston. Jeffrey E. Nusinov, FISHER & WINNER, Baltimore, Maryland, for Appellant Fredric D. Leffler. Rod J. Rosenstein, United States Attorney, Stephen M. Schenning, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Kelly J. Johnston, Fredric D. Leffler, and David A. Uhrich were convicted of charges relating to a scheme to defraud mortgage lenders. Johnston brings her appeal asserting that the district court erred by: 1) upholding the Magistrate Judge's probable cause determination and denying her motion to suppress certain evidence; 2) mismanaging discovery in the case and denying her motion for a continuance; 3) denying her motion to sever; 4) denying her motion for a new trial; 5) denying her motion for judgment of acquittal; 6) incorrectly calculating the amount of loss attributable to her; and 7) allowing the government to ignore its statutory obligations regarding restitution. Leffler also argues that the district court erred in denying his motion to sever.

In Uhrich's appeal, he contends that the district court erred by 1) admitting evidence of certain real estate transactions and 2) sentencing him in violation of the Sixth Amendment to the Constitution.

We disagree with the arguments made by Appellants and, thus, for the reasons stated below, affirm the judgment of the district court.

I.

This case arises out of a scheme to defraud mortgage lenders, organized and led by Walter P. Hammond. From 1997 through 1999,

3

Hammond purchased over 200 properties from long time Baltimore landlords who wished to sell all or part of their portfolios of rental row houses. (J.A. at 1373.) Hammond found investors who agreed to become "buyers" of the houses in exchange for a payment from Hammond of $1,000 to $2,000 per house. The price of the houses averaged between $10,000 and $15,000 per house, and Hammond typically sold the houses for $40,000. (J.A. at 1362.) The mortgage lenders believed they were financing the purchase of the properties by loaning eighty percent of the purchase price of a house to a buyer/investor who was putting up twenty percent of the purchase prices. (J.A. at 815, 1004, 1013, 1306-07, 1328.)

Hammond's scheme revolved around the mortgage loan. The purchase prices of the houses were supported by false appraisals. (J.A. at 1363, 1369, 1508, 1511.) The appraisals were artificially inflated through the use of comparable houses which, in fact, were out of the neighborhood or purchased at inflated prices in other schemes to defraud. (J.A. at 1093, 1363.) Mortgage brokers, working with Hammond, created fraudulent mortgage applications, listing false information. (J.A. at 1368-69.) These applications were submitted to lenders along with the inflated appraisals.

Settlement on the sale of a house to Hammond and on the subsequent sale of the same house from Hammond to an investor usually took place on the same day. One hundred forty five of Hammond's properties were settled at Tower Title and Performance

Title, two title companies run and owned by Co-Defendant Kelly J. Johnston. (J.A. at 1727-28.) Co-Defendant Fredric D. Leffler served as the title companies' lawyer. (J.A. at 1727-28.)

At settlements, investors promised the lenders to pay the mortgages, while Hammond promised the investors that they did not have to pay the mortgages. Hammond supplied the investors with cashier's checks in the amount of the down payment required at the settlement table. At first, the down payment funds came from Hammond's earlier property sales. (J.A. at 1378.) However, certain lenders did not require a cashier's check at settlement. For such lenders, the down payment funds were provided for in one of two ways. At times, the loan proceeds paid to Hammond were reduced by the down payment amount. At other times, Johnston and/or Leffler directed the title company employees to break the escrow and advance to Hammond lender funds which he then used to purchase a cashier's check in the name of the investor. (J.A. at 1379-81.)

Hammond utilized Co-Defendant David A. Uhrich to locate investors and agreed to pay Uhrich a referral fee for any investors Uhrich recruited. (J.A. at 1365.) When one such investor did not have sufficient income to qualify for a mortgage loan, Uhrich suggested that she inflate her income on loan applications by falsely using his company as her employer to add additional income. (J.A. at 1112-13.)

5

Uhrich borrowed $70,000 from another investor, Annette Porter, to be used for the purchase of a house at 9499 Coral Crest Way, Vienna, Virginia. (J.A. at 682-84, 715-16.) Uhrich was to repay the $70,000 in three months. (J.A. at 682-84.) However, he was unable to pay the money back. Instead, Uhrich offered Porter an investment opportunity to make some money by becoming an investor in Hammond's scheme. (J.A. at 686.) Uhrich told Porter they could open an account together and split the money paid by Hammond. (J.A. at 689.)

Additionally, Uhrich and Hammond found large homes in which they wished to live and titled the homes in the name of a fictional buyer, Leandro Rivas. (J.A. at 715-16.) The homes were at 751 Intrepid Way, Davidsonville, Maryland, and at 9499 Coral Crest Way, Vienna, Virginia. Hammond diverted proceeds from his scheme to help purchase these homes, and Uhrich provided the loans and the name Leandro Rivas.

Johnston was indicted on eighteen counts of mail and wire fraud, convicted of five counts, sentenced to a period of imprisonment of 27 months, and ordered to pay approximately $57,000 in restitution, among other penalties. Leffler was indicted on seventeen counts of mail and wire fraud, convicted of all counts, and sentenced to a period of imprisonment of 37 months. Uhrich was indicted on four counts of mail and wire fraud, convicted of three counts, sentenced to a period of imprisonment of 33 months, and

6

ordered to pay a $300 Special Assessment and approximately $82,000 in restitution.  Each of these co-defendants now appeals.

## II.

Johnston contends that the district court erred in upholding the Magistrate Judge's probable cause determination and denying her motion to suppress certain evidence.  We disagree.

### A.

Although we make a de novo review of the denial of the motion to suppress by the district court, the finding of probable cause by the Magistrate Judge is entitled to great deference from this Court.  United States v. Wilhelm, 80 F.3d 116, 118-19 (4th Cir. 1996).  Hence, our responsibility today is merely to make certain that the Magistrate Judge "had a substantial basis for concluding that probable cause existed."  Illinois v. Gates, 462 U.S. 213, 238-39, (1983) (alteration marks, internal quotation marks, and citation omitted).

Search warrants must particularly describe the place to be searched and the items to be seized.  Andresen v. Maryland, 427 U.S. 463, 480 (1976).  "[F]ishing expedition[s]" or "a random exploratory search or intrusion" in violation of the "particularity" requirement of the Fourth Amendment are disallowed. United States v. Owens, 848 F.2d 462, 466 (4th Cir. 1988).

7

The Fourth Amendment mandates that there be probable cause to support that seizable items will be found in the place that is to be searched before a search warrant can properly issue. United States v. Wylie, 705 F.2d 1388, 1391-92 (4th Cir. 1983). Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.

"[I]nvalidation of an entire search based on a seizure of items not named in the warrant is an extraordinary remedy that should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search." United States v. Robinson, 275 F.3d 371, 382 (4th Cir. 2001) (citation and internal quotation marks omitted).

"A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case." United States v. McCall, 740 F.2d 1331, 1335-36 (4th Cir. 1984) (internal quotation marks omitted).

B.

The search and seizure at issue here was made pursuant to a search warrant issued by the Magistrate Judge, whose probable cause determination was based upon the affidavit of FBI Special Agent James Costigan.

Johnston asserts that the government failed to comply with the particularity requirements outlined by this Court. According to Johnston, the affidavit contains broad descriptions of documents to be seized, with no effort made to tailor the description of documents that would prove a criminal act.

Our review of the record, however, convinces us otherwise. The affidavit in question goes to great length to detail: 1)the actions of the appraiser and the mortgage broker in the scheme to defraud, (J.A. 110-11); 2) information concerning the HUD-1 settlement documents (J.A. 112), including the identity of the investors and details concerning their statements that they had provided no funds at settlement (J.A. 114-5, 121, 126-7, 133, 138-9); 3) the location where the settlements at issue occurred (J.A. 114, 126, 132, 136, 163-4); 4) the identity of the employees of the title companies (J.A. 107, 114); 5) the employees who allegedly conducted settlements with false HUD documents (J.A. 112, 114, 136), and 6) information regarding the relationship of Performance Title as the successor of Tower Title. (J.A. 149.)

Therefore, contrary to Johnston's contentions, it is hardly disputable that probable cause existed for the Magistrate Judge to find that evidence of fraud would be found at both of the title company locations. Johnston next argues that the handwritten interlineations in the affidavit supporting the search warrant

9

evidence that the Magistrate Judge ceased being "neutral and detached." We cannot agree.

Simply stated, Johnston's bare allegation that the interlineations demonstrate that the Magistrate Judge lacked objectivity, without more, is an insufficient basis for us to find that the search warrant was invalid. In fact, and as posited by the government, we are of the firm belief that the interlineations in the affidavit establish not that the Magistrate Judge ceased being "neutral and detached" but instead that the Magistrate Judge carefully considered the affidavit before deciding whether to issue the search warrant.

As to Johnston's contentions that the evidence seized was not described with particularity and that too much time had passed between the alleged crime and the search, we are unconvinced. Our review persuades us that the subject search warrant was sufficiently narrow in that it permitted the seizure of documents associated only with Hammond, his corporations and his investors. Accordingly, Johnston's particularity argument fails.

Concerning Johnston's staleness argument, we have earlier held that "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." McCall, 740 F.2d at 1336 (quoting United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972)). "Rather, we must look to all the facts and

10

circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." Id.

The circumstances here are similar to those presented in United States v. Farmer, 370 F.3d 435, 439 (4th Cir. 2004), in that "all of the circumstances pointed toward a finding of probable cause." The allegations were "not mere isolated violations of the law, but criminal activities of a protracted and continuous nature." Id. (alteration mark, citation, and quotation marks omitted). Accordingly, Johnston's staleness argument also fails.

## III.

Johnston alleges that the district court erred by mismanaging discovery and denying her motion for a continuance. This argument is meritless.

### A.

"Discovery matters are committed to the sound discretion of the district court and an error in administering the discovery rules is reversible only on a showing that the error was prejudicial to the substantial rights of the defendant." United States v. Barnes, 634 F.2d 387, 390 (8th Cir. 1980) (citation omitted).

The denial of a continuance is improper only when there is "an unreasoning and arbitrary insistence upon expeditiousness in the

11

face of a justifiable request for delay. . . ." <u>Morris v. Slappy</u>, 461 U.S. 1, 11-12 (1983) (citation and internal quotation marks omitted). Because the trial court enjoys great latitude in managing its time, we review decisions regarding the trial calendar for abuse of discretion. <u>Id.</u> at 12.

B.

Although the frustrations of defense counsel may be understandable, Johnston has failed to provide any argument as to how she was harmed by the government's alleged discovery abuse. Thus, because she has neglected to set forth that she was provably prejudiced by the government's alleged violations, we are unable to find that the district court erred in managing the discovery in the instant matter.

Regarding Johnston's motion for a continuance, Johnston has again failed to argue how she was prejudiced by the district court's denial of the request. Moreover, there is no evidence in the record that the district court possessed "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay. . . ." <u>Morris</u>, 461 U.S. at 11-12 (citation and internal quotation marks omitted). Consequently, we are unable to conclude that the district court improperly denied the motion.

IV.

Johnston and Leffler aver that the district court erred in denying their motions to sever.  We are unconvinced.

A.

The district court's decision to deny a motion to sever will not be overturned "absent a showing of clear prejudice or abuse of discretion."  United States v. Acker, 52 F.3d 509, 514 (4th Cir. 1995) (citation omitted).

Rule 14(a) provides that, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).

"In ruling on a motion for severance, the trial court is vested with discretion; it must carefully weigh the possible prejudice to the accused against the often equally compelling interests of the judicial process, which include the avoidance of needlessly duplicative trials involving substantially similar proof."  United States v.  Jamar, 561 F.2d 1103, 1106 (4th Cir. 1977)(citing United States v. Isaacs, 493 F.2d 1124, 1160 (7th Cir. 1974)).  "The exercise of this discretion will be overturned only for clear abuse affecting substantial rights of the accused."  Id.

(citing Cataneo v. United States, 167 F.2d 820, 823 (4th Cir. 1948)).

The district court has a "continuing duty at all stages of the trial to grant severance if the requisite degree of prejudice appear[s]." United States v. Spider, 800 F.2d 1267, 1273 (4th Cir. 1986 (citation omitted).

B.

Johnston makes two arguments as to how the district court erred in denying her motion to sever. First, she maintains that she was tried with multiple defendants regardless of her minor and passive role in the alleged scheme. According to Johnston, much of the evidence presented at trial against Johnston's co-defendants was totally unrelated to her, causing a serious risk that the jury was unable to make a reliable judgment about her guilt or innocence. We are unpersuaded.

The evidence at trial established that 135 checks from Tower Title and 90 checks from Performance Title, totaling $3,730,625.49, were issued to Hammond or his company during the course of the fraudulent scheme. The evidence further demonstrates that Johnston was the owner of the two title companies that handled most of the fraudulent real estate transactions and that she participated in some of the fraudulent transactions. Thus, even if Johnston was not directly involved in all aspects of the fraudulent scheme, it

14

is clear that her criminal acts furthered the scheme. Therefore, we find no undue prejudice here.

Second, Johnston argues that she was prejudiced by her joint trial with Leffler, whose refusal to testify thwarted her ability to fully and fairly defend herself. Thus, according to Johnston, she was denied the availability of corroborating testimony regarding advice of counsel from Leffler. Johnston fails, however, to provide any reasonable basis for us to assume that Leffler would have actually testified on her behalf at a separate trial or that his testimony would have been profitable for her defense. Accordingly, we find no reversible error in the district court's denial of the motion to sever on this basis.

## C.

Concerning Leffler's motion to sever, he alleges that Johnston's handwriting expert was called for no other purpose than to attack Leffler on matters outside the indictment. According to Leffler, Johnston employed the handwriting expert to suggest Leffler's involvement in matters outside the government's case, mainly the forgery of Johnston's signature on certain checks that were made payable to Leffler's company, Arch Property Services (ARP). The government had earlier raised questions about ARP for reasons unrelated to the checks.

We have reviewed the record, however, and are unable find any reversible error. Although neither the government nor Johnston

15

suggested that Leffler forged the checks, there can be no question that there was an inference that Leffler was not entitled to the funds that were deposited into his account. Nevertheless, having "weigh[ed] the possible prejudice to the accused against the . . . equally compelling interests of the judicial process, which include[s] the avoidance of needlessly duplicative trials involving substantially similar proof[,]" Jamar, 561 F.2d at 1106, we are unable to conclude that the district court erred.

Leffler next maintains that Johnston's testimony exculpated Johnston while inculpating Leffler. According to Leffler, Johnston's testimony that she had in fact committed criminal acts, but only in reliance of Leffler's legal advice, prejudiced Leffler, thus denying him a fair trial. We find this contention to be without merit.

When the defendant neglects to demonstrate in what manner his defense "is irreconcilable with that of his co-defendant, there is no basis to grant the defendant's motion for severance." United States v. Spitler, 800 F.2d 1267, 1272 (4th Cir. 1986) (citation omitted).

Leffler's counsel contended at trial that Leffler believed that there were "legitimate business reasons" for his handling Hammond's real estate transactions in the manner that he did. (J.A. 399-401.) Thus, the jury was asked to believe that Leffler had no criminal intent when he helped process the transactions. Leffler

16

also argues that he did not know of any of the illegal activities associated with the scheme.

As to the question of criminal intent, we are unable to fathom, and Leffler has failed to submit, how Leffler's defense that he believed Hammond's strategy to be legitimate is contradictory to Johnston's defense that she relied on Leffler's guidance. Therefore, Leffler has failed to meet his burden as to this issue.

Concerning Leffler's asseveration that he lacked knowledge of the illegal activities connected with the scheme, it is indisputable that Leffler's defense on this issue conflicts with that of Johnston. "The mere presence of hostility among defendants, however, or the desire of one to exculpate himself by inculpating another are insufficient grounds to require separate trials, and thus, antagonistic defenses do not per se require severance even if the defendants attempt to cast the blame on each other." Spitler, 800 F.2d at 1271 (alteration marks, citations, and quotation marks omitted).

"To make such showing where severance has been sought on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that the differences are irreconcilable, and that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." Id. at 1272 (alteration marks,

17

citations, and quotation marks omitted).  Leffler's failure to make such a showing is fatal to his argument on this issue.

V.

Johnston states that the district court erred in denying her motion for a new trial.  We find this contention to be unavailing.

A.

We review a district court's denial of a Federal Rule of Criminal Procedure 33 motion for an abuse of discretion.  <u>United States v. Perry</u>, 335 F.3d 316, 320 (4th Cir. 2003)  "[A] court should exercise its discretion to grant a new trial sparingly . . . and . . . should do so only when the evidence weighs heavily against the verdict."  <u>Id.</u>  (internal quotation marks and citations omitted).

B.

Simply stated, the evidence before us does not weigh heavily against the verdict.  In fact, the opposite is true.  For instance, each of the HUD statements in the real estate transactions was false in as much as each listed the amount of money to be collected from the buyer/borrower, although neither Johnston nor her employees ever collected any of these funds.  She also, on occasion, fraudulently broke the escrow and disbursed the lender's funds to Hammond, who would then purchase a cashier's check in the borrower's name.  Thus, we are unpersuaded by Johnston's arguments

18

on this issue.  We also find Johnston's arguments concerning inconsistent verdicts futile.  Hence, from our exhaustive review of the record in this matter, we are unable to conclude that the district court erred in denying this motion.

VI.

Johnston maintains that the district court erred in denying her motion for judgment of acquittal.  We are unpersuaded.

A.

We review de novo a district court's denial of a motion for judgment of acquittal.  United States v. Gallimore, 247 F.3d 134, 136 (4th Cir. 2001).

To determine if there was sufficient evidence to support a conviction, we consider whether, taking the evidence in the light most favorable to the government, substantial evidence supports the jury's verdict.  Glasser v. United States, 315 U.S. 60, 80 (1942) ("The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it.").

Substantial evidence is defined as "that evidence which 'a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'"  United States v. Newsome, 322 F.3d 328, 333 (4th Cir. 2003) (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996)).  We review both the direct and circumstantial evidence and

19

accord "the government the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982) (citation omitted).

When reviewing claims of sufficiency of the evidence, "[t]he relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." Tresvant, 677 F.2d at 1021 (citations omitted).

B.

As we have already observed, even if Johnston was not directly involved in all aspects of the fraudulent scheme, it is clear that her criminal acts furthered the scheme. She owned the title companies that participated in the scheme and profited from the illegal activity. Without her participation, the scheme would not have succeeded. Therefore, we find no error in the district court's denial of this motion.

Johnston also argues that the district court's decision to reverse the order of counsel's closing argument as another reason that it should have granted Johnston a new trial. Johnston maintains that her defense was, in large measure, dependant upon the order of the closing argument. Johnston, however, neglects to posit how her counsel's argument would have differed if the order

20

had been as Johnston wished.  Hence, we have no basis on which to determine error.

## VII.

Johnston asserts that the district court incorrectly calculated the amount of loss attributable to her.  According to Johnston, the only evidence submitted by the government in support of the loss number was flawed.  Moreover, Johnston argues that she was not provided with an opportunity to fairly litigate the issue of loss at her sentencing.  We are unpersuaded.

### A.

When reviewing the loss amount calculated by the district court, we review the factual findings of the district court for clear error, and its legal interpretation of the Sentencing Guidelines de novo.  United States v. Parsons, 109 F.3d 1002, 1004 (4th Cir. 1997).

### B.

The government presented evidence that the loss was between $2.5 million and $5 million, but the district court found it was between $1.5 million and $2.5 million; thus increasing the base level offense by 12 levels.  Johnston fails, however, to reveal what she thinks the amount of loss to be.  Given the facts of this case, we conclude that the district court made a reasonable estimate in making its loss calculation.

With adjustments for abuse of a position of trust and more than one victim/more than minimal planning, the Sentencing Guidelines calculation came to a level 22, with a sentencing range of 41-51 months. The district court departed downward, however, to correct sentencing disparity between the defendants. We find no error.

## VIII.

Johnston maintains that the district court erred by allowing the government to ignore its statutory obligations regarding restitution. We find this error to be harmless.

### A.

We review a restitution order for an abuse of discretion. United States v. Vinyard, 266 F.3d 320, 333 (4th Cir. 2001).

### B.

It appears that the restitution information was not included in Johnston's presentence report as required by 18 U.S.C. § 3664. Nevertheless, testimony at trial and the business records were the basis for the district court's restitution determination. Thus, because Johnston had notice as to the amount of the restitution, as well as to whom it was payable, we are unable to find any reversible error. See United States v. Dando, 287 F.3d 1007, 1010 (10th Cir. 2002) ("Defendant ... received the functional equivalent of the notice required by the statute."); United States v.

22

Catoggio, 326 F.3d 323, 329-30 (2d Cir. 2003) (rejecting defendant's argument that because an order of restitution must be entered within 90 days of sentencing, the court should vacate the restitution order without remanding for further proceedings).

Moreover, because Johnston fails to demonstrate actual prejudice from the government's failure to comply with the procedural requirements of § 3664, we are unable to find any error by the district court to be more than harmless.

> [T]he purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets.... Mindful of these goals, we have ruled that a district court's failure to determine identifiable victims' losses within ninety days after sentencing, as prescribed by § 3664(d)(5), will be deemed harmless error to the defendant unless he can show actual prejudice from the omission.

United States v. Zakhary, 357 F.3d 186, 191 (2d Cir. 2004). See also United States v. Johnson, 400 F.3d 187, 198-99 (4th Cir. 2005) (stating that the failure to abide by the ten-day limit in section 3664(d)(5) is harmless error absent a showing of prejudice); United States v. Vandeberg, 201 F.3d 805, 814 (6th Cir. 2000) (noting that not affording a defendant an opportunity to be heard as to the proposed amount of restitution within the ninety days prescribed by § 3664(d)(5) is harmless error because "the court provided him ample opportunity to object to the amount thereafter"); United States v. Grimes, 173 F.3d 634, 638-39 (7th Cir. 1999) (holding

23

that because intended beneficiaries of § 3664(f)(1)(A) are victims, defendants have no rights under § 3664 and trial court's failure to name all of the victims in the restitution order is not error).

IX.

Uhrich submits that the district court erred in admitting evidence of certain real estate transactions. We reject the argument.

A.

The Court reviews an alleged error in the admission of evidence for an abuse of discretion. United States v. Gravely, 840 F.2d 1156, 1162 (4th Cir. 1988).

B.

Uhrich argues that the district court erred in admitting evidence concerning the Interprid Place and Coral Crest real estate transactions in violation of Rule 404(b) of the Federal Rules of Evidence. Our review of the record, however, convinces us that the district court admitted the evidence as "a part of a scheme that's alleged in the indictment . . . ." (J.A. 247 O-247 P.)

The record evidences that Hammond and Uhrich found large homes in which they wished to live, Interprid Place and Coral Crest respectively. Hammond then diverted proceeds from his fraudulent scheme to help purchase these homes, and Uhrich provided the loans and the name Leandro Rivas, a fictional buyer.

24

Uhrich also borrowed $70,000 from investor/buyer Annette Porter, and then used those funds, along with money from Hammond, to buy Carol Crest. As a result, the mortgage lenders were left with mortgage notes signed by Rivas, a non-existent person. Uhrich also recruited other investors for Hammond's fraudulent scheme.

The Interprid Way and Coral Crest purchases provide overwhelming evidence of the criminal relationship between Hammond and Uhrich. Hammond may have led the fraudulent scheme, but it is clear that Uhrich was a part of it. Accordingly, we can find no error as to the district court's admission of this evidence.


X.

According to Uhrich, he was sentenced in violation of the Sixth Amendment to the Constitution. We are unable to agree.

A.

Consistent with the mandate of United States v. Booker, 543 U.S. 220 (2005), we follow the unreasonableness standard in our review of an original sentence. United States v. Hughes, 401 F.3d 540 (4th Cir. 2005); United States v. Green, 436 F.3d 449 (4th Cir. 2006); United States v. Davenport, 445 F.3d 366 (4th Cir. 2006).

Uhrich contends that the district court violated his Sixth Amendment rights by relying on facts that were not found by the jury nor admitted by Uhrich; specifically, the amount of loss arising out of Interprid Way.  Consequently, according to Uhrich, the district court imposed an improper sentence.

This argument, however, contradicts the statement of Uhrich's counsel at Uhrich's sentencing hearing when he stated that the amount of loss for Interprid Way was not included in the amount of loss attributed to Uhrich.  (J.A. 2630.)  Instead, the amount of loss appears to have been wholly based on the losses resultant in the actions of the investors whom Uhrich recruited to participate in the fraudulent scheme.  Id.  Therefore, we reject this argument.

Uhrich also maintains that his sentence is unreasonable pursuant to Davenport. As the district court stated, however,

> [W]hile I think the government has made a very substantial showing that would justify the Court's conclusion that the amount of loss was more than $800,000 in Mr. Uhrich's case, out of an abundance of caution, in an effort to give the defendant absolutely the benefit of any doubt, not just reasonable doubt, I am going to go to the next level and treat Uhrich as having caused the loss, foreseen and contemplated a loss of more than $500,000 but not more than $800,000.
>
> So, that will reduce the final offense from a level 19, subject to any other consideration, from a level 19 to a level 18.

(J.A. 2632.)  Based on Uhrich's criminal history category III, his final guideline range was 33-41 months.  The trial court imposed a

33 month sentence.    Hammond, the mastermind of the fraudulent scheme, was given a 37 month sentence.

Comparing the roles of Hammond and Uhrich, it may appear at first blush that Uhrich's sentence is unreasonable.    We observe, however, that Hammond pled guilty, cooperated with the government, and testified at trial, thus reducing his offence level.    Also, unlike Uhrich, Hammond had no prior convictions.    Hence, we find the sentence to be reasonable.

XI.

Accordingly, for the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

27