**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1078**

AMERICAN PETROLEUM INSTITUTE; AMERICAN FUELS AND
PETROCHEMICAL MANUFACTURERS ASSOCIATION,

Plaintiffs – Appellants,

v.

ROY A. COOPER, III, Attorney General of the State of North
Carolina,

Defendant – Appellee,

NORTH CAROLINA PETROLEUM AND CONVENIENCE MARKETERS
ASSOCIATION,

Intervenor/Defendant – Appellee.

---------------------------

PETROLEUM MARKETERS ASSOCIATION OF AMERICA,

Amicus Supporting Appellees.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh. Louise W. Flanagan,
District Judge. (5:08-cv-00396-FL)

Argued: January 31, 2013          Decided: June 6, 2013

Before MOTZ, KING, and AGEE, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Motz and Judge King joined.

———————————

**ARGUED:** Robert Allen Long, Jr., COVINGTON & BURLING, LLP, Washington, D.C., for Appellants. Melissa Lou Trippe, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Charles Foster Marshall, III, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Thomas L. Cubbage III, Henry B. Liu, Kristen E. Eichensehr, COVINGTON & BURLING, LLP, Washington, D.C., for Appellants. Alexander McClure Peters, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee Roy A. Cooper, III; Eric M. David, Mary F. Peña, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Raleigh, North Carolina, for Appellee North Carolina Petroleum and Convenience Marketers Association. Alphonse M. Alfano, BASSMAN, MITCHELL & ALFANO, CHARTERED, Washington, D.C., for Amicus Supporting Appellees.

AGEE, Circuit Judge:

Plaintiffs American Petroleum Institute ("API") and American Fuels and Petrochemical Manufacturers Association ("AFPMA") (collectively "Plaintiffs") brought federal preemption-based challenges in the district court seeking to enjoin enforcement of North Carolina's Ethanol Blending Statute ("the Blending Statute"), N.C. Gen. Stat. § 75-90 (2008). Concluding that the Blending Statute was not preempted under any of the grounds advanced by Plaintiffs, the court granted summary judgment in favor of the State of North Carolina and the Intervenor-Defendant, the North Carolina Petroleum and Convenience Marketers Association ("NCPCMA") (collectively "Defendants"). For the reasons set forth below, we affirm the district court's judgment in part, vacate it in part, and remand for further proceedings consistent with this opinion.[1]

---

[1] The Plaintiffs in this action are two trade organizations representing the natural gas and oil industry in the United States, including manufacturers and refiners of oil and gasoline who import gasoline into North Carolina. NCPCMA, the Defendant-Intervenor is a statewide trade association, representing businesses engaged in the marketing of petroleum and convenience products. Over Plaintiffs' objection, the district court allowed the NCPCMA to intervene as a defendant.

I.

This appeal involves the complex interplay of federal and state regulatory schemes concerning the distribution of renewable fuels. We begin with an overview of the applicable federal renewable fuel program and the state's Blending Statute.

In an attempt to increase the quantity of renewable fuels in the marketplace, Congress enacted a statutory regime that we refer to generally as the "federal renewable fuel program." See Energy Policy Act of 2005 ("the Act"), Pub. L. No. 109-58 (codified at 42 U.S.C. § 7545(o)). In furtherance of the Act, Congress authorized the Environmental Protection Agency ("EPA") to adopt regulations to mandate suppliers such as gasoline importers and refiners (but not distributors or marketers) to offer for sale renewable fuel, e.g., ethanol.[2] See 40 C.F.R. § 80.1406. The EPA is charged with determining, annually, how much renewable fuel should enter the marketplace, and assigning volume-based quotas to obligated entities in order to meet the annual requirement.

To monitor compliance, each gallon of renewable fuel produced or imported into the United States is assigned a unique

---

[2] The Act defines "renewable fuel" as "fuel that is produced from renewable biomass," 42 U.S.C. § 7545(o)(1)(J), which includes ethanol, biomass-based diesel, and cellulosic biofuel, to name a few. Id. This appeal only concerns the practice of blending ethanol with conventional gasoline.

renewable identification number ("RIN"). See 40 C.F.R. § 80.1128. These RINs are attached to the fuel, and transferred along with the fuel to purchasers. The RINs are tracked by the EPA, and if an obligated party fails to obtain an adequate number of RINs, it may be subject to a significant monetary penalty. See 40 C.F.R. §§ 80.1160, 80.1161, 80.1163. Once renewable fuel is blended with traditional gasoline (most often at a 1:9 ratio, creating the blended fuel "E-10" meaning 10 percent ethanol), the RIN separates from the renewable fuel, becomes the property of the entity who blended the renewable fuel with the gasoline, and may be traded on the open market. Under this mechanism, obligated parties who do not themselves blend renewable fuel with conventional gasoline may acquire RINs and also meet the EPA mandate on the quantity of RINs.[3]

At the heart of the issues in this case are the two common methods employed to blend ethanol with conventional gasoline. The first, "inline" blending, is conducted by suppliers and takes place at the terminal where distributors and retailers

---

[3] Related to the federal renewable fuel program is the Volumetric Ethanol Excise Tax Credit ("VEETC"), 26 U.S.C. § 6426. The VEETC grants a tax credit of fifty-one cents per gallon to an entity that blends ethanol with conventional gasoline. Congress allowed the VEETC to expire at the end of 2011. However, earlier this year, Congress renewed the VEETC through the end of 2013. See American Taxpayer Relief Act of 2012, Pub. L. No. 112-240 § 412(a).

purchase the gasoline product from the suppliers.[4]  The inline blending process consists of unblended ("pure") gasoline at the terminal being transferred to a holding container denominated as a "terminal rack."  A computer measures and pumps ethanol from a separate tank (along with the supplier's brand-specific additives) into the pure gasoline.  The blended gasoline is then transferred from the terminal rack to a transport vehicle for delivery to the retailer.

The second blending method, "splash blending,"[5] describes a process by which a retailer purchases unblended gasoline from a supplier at the supplier's terminal.  The retailer adds ethanol, purchased separately from an ethanol distributor, to the unblended gasoline in the transport vehicle by pumping the ethanol into that vehicle's tank.  The ethanol is blended with

---

[4]  For purposes of this opinion we will use the terms "supplier" and "retailer" to describe the relevant parties on either end of the ethanol transactions at issue as those terms are used in the Blending Statute.  A supplier may include parties also denominated as "refiners" or "manufacturers," but are the entities bringing pure gasoline for sale to "retailers" in North Carolina.  "Retailers" may include parties also denominated as "marketers" or "distributors" but are the parties delivering ethanol for sale either to the ultimate consumer or final market vendor.

[5]  "Splash blending" is sometimes referred to in the record as "below the line" or "below the rack" blending.  The terms are used interchangeably, however, and we simply refer to the practice as "splash blending."

6

the "pure" gasoline by the vehicle's movement, i.e., "splash" blending.

The Plaintiffs contended before the district court, and on appeal, that splash blending is more subject to error than inline blending and thereby inhibits their ability to preserve and verify the quality of their trademarked goods. In other words, they assert splash blending is more likely than inline blending to produce a blended gasoline product with an incorrect ethanol to gasoline ratio, which, among other things, could adversely affect motor vehicle performance. According to suppliers, they have tried to prevent these errors by transitioning away from splash blending and installing inline blending equipment at their terminals in North Carolina.

Against this backdrop the North Carolina General Assembly enacted the Blending Statute in 2008, which provides, in pertinent part:

> (b) A supplier that imports gasoline into the State shall offer gasoline for sale to a distributor or retailer that is not preblended with fuel alcohol and that is suitable for subsequent blending with fuel alcohol.

> (c) The General Assembly finds that use of blended fuels reduces dependence on imported oil and is therefore in the public interest. The General Assembly further finds that gasoline may be blended with fuel alcohol below the terminal rack by distributors and retailers as well as above the terminal rack by suppliers and that there is no reason to restrict or prevent blending by suppliers, distributors, or retailers. Therefore, any provision

7

of any contract that would restrict or prevent a distributor or retailer from blending gasoline with fuel alcohol or from qualifying for any federal or State tax credit due to blenders is contrary to public policy and is void. This subsection does not impair the obligation of existing contracts, but does apply if such contract is modified, amended, or renewed.

N.C. Gen. Stat. § 75-90. The Blending Statute thus requires those entities importing gasoline into North Carolina (i.e., the suppliers) to offer unblended gasoline for sale to retailers and prevents suppliers from contractually restricting retailers from splash blending, i.e., blending ethanol with gasoline themselves.

In 2008, Plaintiffs filed a complaint against the State of North Carolina ("the State") in the U.S. District Court for the Eastern District of North Carolina, seeking to enjoin the State from enforcing the Blending Statute. The Plaintiffs alleged that the Blending Statute was preempted by (1) the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801-2841; (2) the federal renewable fuel program; and (3) the Lanham Act, 15 U.S.C. §§ 1051-1113.[6] In 2010, the parties made certain factual

---

[6] Plaintiffs also raised a challenge to the Blending Statute based on the Constitution's Commerce Clause. The district court twice granted summary judgment in favor of Defendants on that claim, and Plaintiffs have not challenged the disposition of that claim on appeal. Thus, this claim has been abandoned by Plaintiffs. See United States v. Brooks, 524 F.3d 549, 556 n.11 (4th Cir. 2008) (issue not raised in opening brief is abandoned).

8

stipulations and filed cross-motions for summary judgment relating to Plaintiffs' facial challenges to the Blending Statute.

The district court granted summary judgment in favor of Defendants on Plaintiffs' facial challenges, and correspondingly denied Plaintiffs' motion for summary judgment (hereinafter the "Facial Summary Judgment Order"). See Am. Petroleum Inst. v. Cooper, 681 F. Supp. 2d 635 (E.D.N.C. 2010). In doing so, the court held that the Blending Statute was consistent with articulated Congressional goals in the context of the federal renewable fuel program. Relying heavily on this Court's opinion in Mobil Oil Corp. v. Virginia Gasoline Marketers & Automobile Repair Association, 34 F.3d 220 (4th Cir. 1994), the district court also rejected Plaintiffs' claims that either the Lanham Act or the PMPA preempted the Blending Statute.

Following the district court's Facial Summary Judgment Order, the parties engaged in further discovery on Plaintiffs' claims that the Blending Statue was preempted as applied to them. The parties again filed cross-motions for summary judgment, and the district court again granted summary judgment in favor of the Defendants, and correspondingly denied the Plaintiffs' motion for summary judgment ("As-Applied Summary Judgment Order"). See Am. Petroleum Inst. v. Cooper, 835 F. Supp. 2d 63 (E.D.N.C. 2011).

On the federal renewable fuel program preemption issue, the court concluded that suppliers were essentially seeking the ability to exclude retailers from the selling or trading of RINs, and held that the federal renewable fuel program did not contemplate such a monopoly. In rejecting Plaintiffs' as-applied Lanham Act challenge, the court largely reiterated many of the conclusions set forth in the Facial Summary Judgment Order, including its holding that the Blending Statute does not affect the ability of suppliers to engage in quality control of their trademarked products. Lastly, the court rejected Plaintiffs' claim that, as applied to them, the Blending Statue prohibited them from terminating a franchise relationship for "willful adulteration" of suppliers' products, in violation of the PMPA.

The district court then entered a final judgment in favor of Defendants on all of Plaintiffs' claims. Plaintiffs' noted a timely appeal of that judgment, and we have jurisdiction pursuant to 28 U.S.C. § 1291.[7]

---

[7] Defendants assert that we lack jurisdiction to consider issues on appeal pertaining to Plaintiffs' facial challenge to the Blending Statute under the PMPA because Plaintiffs failed to timely appeal the district court's Facial Summary Judgment Order.

This argument lacks merit. The Facial Summary Judgment Order was not an appealable final judgment because it did not dispose of all of Plaintiffs' claims. See Fox v. Baltimore Police Dep't, 201 F.3d 526, 530 (4th Cir. 2000) ("[A] district (Continued)

10

## II.

We review the district court's summary judgment ruling de novo, applying the same standard applied by the district court. See Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.) (en banc), cert. denied, 132 S. Ct. 781 (2011). We "view all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party," T-Mobile Ne., LLC v. City Council of Newport News, Va., 674 F.3d 380, 385 (4th Cir.) (internal quotation marks omitted), cert. denied, 133 S. Ct. 264 (2012), here, the Plaintiffs. Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

Plaintiffs contend that the district court erred in concluding that the Blending Statute was not preempted on the basis of the Lanham Act, the PMPA, or the federal renewable fuel program. Defendants' argue, as a threshold matter, that there

---

court order is not 'final' until it has resolved all claims as to all parties."). The judgment ultimately entered by the district court explicitly referenced both of its summary judgment orders, and Plaintiffs have taken a proper appeal from that judgment. We thus have subject matter jurisdiction as to all the issues now raised by Plaintiffs on appeal.

is no preemption because suppliers can opt out of the requirements of the Blending Statute. Before addressing these specific contentions, we review certain fundamental principles in the consideration of a preemption claim.

## A.    Preemption Doctrine

Under the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2, state laws that conflict with applicable federal law are preempted. Cox v. Shalala, 112 F.3d 151, 154 (4th Cir. 1997) (citation omitted). When conducting a preemption analysis, we are guided first and foremost by the maxim that "the purpose of Congress is the ultimate touchstone in every pre-emption case." Wyeth v. Levine, 555 U.S. 555, 565 (2009). That said, when determining the interplay of the federal and state statutes at issue, we are obliged to attempt to harmonize those statutes if reasonably possible. See Anderson v. Babb, 632 F.2d 300, 308 (4th Cir. 1980) ("a court should avoid, if possible, that construction of a statute that would result in its constitutional invalidation."). We recognize and apply a rebuttable presumption that Congress, by enacting a federal statute, did not intend to preempt state law. Columbia Venture, LLC v. Dewberry & Davis, LLC, 604 F.3d 824, 830 (4th Cir. 2010).

Nonetheless, Congress may evince an intent to preempt state law in three ways. First, federal law may preempt state law by expressly declaring Congress' intent to do so ("express

12

preemption"). <u>Cox</u>, 112 F.3d at 154. Second, Congress can "occupy the field by regulating so pervasively that there is no room left for the states to supplement federal law" ("field preemption"). <u>Id.</u> And third, a state law is preempted "to the extent it actually conflicts with federal law" ("conflict preemption"). <u>Id.</u> Conflict preemption "includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Arizona v. United States</u>, 567 U.S. ---, ---, 132 S. Ct. 2492, 2501 (2012) (internal quotation marks and citations omitted). Plaintiffs do not contend that Congress has "occupied the field" with respect to ethanol blending, but do argue conflict and express preemption apply to the Blending Statute.

We now turn to the specific issues of preemption on appeal.

## B. Opt Out

Defendants first argue that the Blending Statute is not preempted under any theory advanced by Plaintiffs because suppliers are able to opt out of the Blending Statute. Specifically, the Defendants observe that although the Blending Statute requires suppliers who import gasoline to offer unblended gasoline for sale, the Blending Statute does not specify the amount of unblended gasoline that must be sold, the

13

minimum number of terminals at which unblended gasoline must be sold, or the grades of unblended gasoline that must be sold. The Defendants assert that, as a matter of record, some suppliers are already attempting to mitigate the effects of the Blending Statute by, for example, selling unblended gasoline only at a single terminal in North Carolina, or offering only a single grade of unblended gasoline that, when mixed with ethanol, only produces a more expensive, premium gasoline product. Defendants also posit that the Blending Statute could potentially be avoided by suppliers choosing to import only conventional blendstock for oxygenate blending ("blendstock"), a sub-octane gasoline product that only reaches a standard 87-octane when mixed with ethanol.

The district court did not accept Defendants' opt-out argument and neither do we. Defendants (including the State) have not conceded before the district court or this Court that the suppliers' actions in attempting to remove themselves (i.e., opt-out) from the ambit of the Blending Statute are permitted under North Carolina or federal law. This fact alone gives us considerable pause as to the validity of Defendants' opt-out contentions. More to the point, however, the mere fact that suppliers may be able to take certain steps to limit the reach of the Blending Statute does not equate to an ability to "opt out" of the Blending Statute for preemption purposes. Indeed,

14

Defendants cite no case, and we identify none, in support of their argument that an otherwise-preempted state law survives preemption merely because those subject to it can alter their conduct in order to avoid some part of its ambit. Defendants' argument thus lacks merit.

## C. PMPA Preemption

In Mobil Oil, we explained that

> The [PMPA] governs the relationships between petroleum refiners and their retail franchisees. The PMPA's primary purpose is to protect petroleum franchisees from arbitrary or discriminatory terminations and nonrenewals. S.Rep. No. 731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S.C.C.A.N. 873, 874. [The PMPA] also serves two secondary purposes: to provide uniformity in the law governing petroleum franchise termination and nonrenewal, and to allow franchisors flexibility in dealing with franchisee misconduct or changes in market conditions. 1978 U.S.C.C.A.N. at 877. It expressly preempts state law governing termination or nonrenewal which differs from its provisions. 15 U.S.C.A. § 2806(a).

34 F.3d at 223. We also observed that "Congress used very broad language to define the PMPA's preemptive scope. The [PMPA] preempts any state law 'with respect to' termination or nonrenewal which differs from the PMPA." Id. at 225.

The Mobil Oil court noted that the state law at issue there

> narrows the grounds for termination available to franchisors operating in Virginia. Under the PMPA, if contractual terms are reasonable and material, a franchisee's failure to comply with them is legitimate grounds for termination. Unless the terms prohibited by [the state law] would in all circumstances be unreasonable and immaterial—a finding we are unwilling

15

to make—[the state law] eliminates grounds for termination that would be available under the PMPA.

Id. at 224 (internal citations omitted). Thus, the express preemption previsions of the PMPA preempted the Virginia statute at issue in Mobil Oil.

In 1994, however, just months after the Mobil Oil decision, Congress passed certain amendments to the PMPA that are relevant here. First, Congress amended the PMPA such that a franchisor could no longer terminate or nonrenew a franchise agreement for failure to comply with a reasonable franchise agreement provision, if that provision is "illegal or unenforceable" under otherwise applicable state law. See 15 U.S.C. §§ 2802(b)(2)(A); 2801(13)(C) ("the following are grounds for termination of a franchise . . . : A failure by the franchisee to comply with any provision of the franchise," but "the term 'failure' does not include . . . any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State.").

Second, Congress narrowed the grounds for preemption by prohibiting a franchisor from conditioning a new franchise or renewal upon an agreement "to release or waive . . . any right that the franchisee may have under any valid or applicable State law." 15 U.S.C. § 2805(f)(1)(B).

In the absence of the 1994 amendments, Plaintiffs would have a strong argument supporting their PMPA preemption claim.

We agree with the district court, however, that the 1994 amendments to the PMPA significantly narrowed the prior statute's preemptive scope so that the current version of the PMPA does not preempt the Blending Statute. The district court properly held that the 1994 amendments give states "the authority to pass substantive laws making certain franchise provisions illegal or unenforceable." (J.A. 95). To read the 1994 amendments otherwise would render those portions of the PMPA a nullity. It is axiomatic that when interpreting a statute, this Court should strive to "avoid any interpretation that may render statutory terms meaningless or superfluous." Discover Bank v. Vaden, 396 F.3d 366, 369 (4th Cir. 2005). Thus, for PMPA purposes only, the 1994 amendments render the Blending Statute immune from Plaintiffs' preemption claim.

As an alternative argument, Plaintiffs contend that the Blending Statute conflicts with certain provisions of the PMPA that allow a franchisor to terminate a franchise agreement for "willful adulteration" of a petroleum product by the franchisee. The PMPA provides that a franchisor may terminate a franchise relationship on the basis of "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal . . . is reasonable." 15 U.S.C. § 2802(b)(2)(C). As relevant here, "an event which is relevant to the franchise relationship, [etc.]"

17

includes "willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations." § 2802(c)(10)

We do not agree with Plaintiffs that splash blending constitutes the sort of "willful adulteration" contemplated by Congress in § 2802. First, the language of the PMPA strongly suggests that "adulteration" is similar to "misbranding," or "other trademark violations." 15 U.S.C. § 2802(c)(10) (emphasis added). This is consistent with the holdings of those cases (cited by the district court) that have interpreted "adulteration" to mean some form of mislabeling or misbranding. See Wisser Co. v. Mobil Oil Corp., 730 F.2d 54, 60 (2d Cir. 1984) (equating "misbranding" of gasoline with adulteration provision of PMPA); Little Tor Auto Ctr. v. Exxon Co. USA, 830 F. Supp. 792, 795 (S.D.N.Y. 1993) (same); Shell Oil Co. v. Wentworth, 822 F. Supp. 878, 882 (D. Conn. 1993) (same); Shell Oil Co. v. Avar Corp., No. 97 C 4479, 1998 WL 312119, at *3 (N.D. Ill. June 5, 1998) ("commingling" of fuel a violation of adulteration provision of PMPA); Aoude v. Mobil Oil Corp., Civ. No. 92-10495 RGS, 1994 WL 548061, at *1–3 (D. Mass. Sept. 2, 1994) (mixing two suppliers' gasoline products constitutes adulteration).

The statute itself lists "willful adulteration" seriatim with "mislabeling, misbranding of other motor fuels or other trademark violations," suggesting that "willful adulteration"

18

must be understood in the same frame of references as mislabeling or applying a nongenuine or altered mark. Moreover, within the context of this case, the district court correctly reasoned that "blending fuel with renewable fuel is an accepted industry practice that Congress has recognized and mandated through federal law." (J.A. 526.) It is difficult to imagine that when Congress stated that a franchise agreement could be terminated for willful adulteration, it meant to include ethanol blending, a practice which Congress not only mandates but also incentivizes through tax credits. In sum, there is no merit to Plaintiffs' claim that splash blending would constitute "willful adulteration" as that term is understood in statute and case law for PMPA purposes so as to bring about a conflict between it and the Blending Statute.

Accordingly, we agree with the district court that the PMPA does not preempt the Blending Statute, either expressly or by way of conflict preemption. The district court did not err in granting summary judgment to Defendants as to this issue.

### D. Federal Renewable Fuel Program Preemption

Plaintiffs also argue that the Blending Statute is preempted by the federal renewable fuel program. We conclude that the district court correctly held that it is not.

19

At the outset, we note our agreement with what the district court described as the "uncontested purpose" of the federal renewable fuel program:

> "to ensure jobs . . . [through] secure, affordable, and reliable energy" and "to move the United States toward greater energy independence and security" by "increas[ing] the production of clean, renewable fuels . . . ." Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (establishing renewable fuel program); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (amending renewable fuel program). To that end, Congress created annual goals for renewable fuel usage, and directed the Environmental Protection Agency ("EPA") to create regulations that would "ensure that gasoline sold or introduced into commerce in the United States . . . contains the applicable volume of renewable fuel determined [by that table]." 42 U.S.C. § 7545(o)(2)(A)(I), (B).

(J.A. 502-03.) In promulgating final rules for the creation of the RIN trading system under the federal renewable fuel program, the EPA described its objectives as follows:

> [The RIN system] was developed in light of the somewhat unique aspects of the [renewable fuel] program. . . . [U]nder this program the refiners and importers of gasoline are the parties obligated to comply with the renewable fuel requirements. At the same time, <u>refiners and importers do not generally produce or blend renewable fuels at their facilities and so are dependent on the actions of others for the means of compliance.</u> Unlike EPA's other fuel programs, the actions needed for compliance largely center on the production, distribution, and use of a product by parties <u>other than refiners and importers</u>. In this context, we believe that the RIN transfer mechanism should focus primarily on facilitating compliance by refiners and importers and doing so in a way that imposes minimum burden on other parties and minimum disruption of current mechanisms for distribution of renewable fuels.

20

Our final program does this by relying on the current market structure for ethanol distribution and use and avoiding the need for creation of new mechanisms for RIN distribution that are separate and apart from this current structure. Our program basically requires RINs to be transferred with renewable fuel until the point at which the renewable fuel is purchased by an obligated party or is blended into gasoline or diesel fuel by a blender. This approach allows the RIN to be incorporated into the current market structure for sale and distribution of renewable fuel, and avoids requiring refiners to develop and use wholly new market mechanisms. While the development of new market mechanisms to distribute RINs is not precluded under our program, it is also not required.

Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 Fed. Reg. 23,900, 23,937 (May 1, 2007) (emphases added). The EPA's statements are instructive insofar as they recognize that, generally speaking, retailers would be the parties who carried out the blending of ethanol with conventional gasoline.

This determination by the agency charged with carrying out the renewable fuel program counsels a finding that the federal renewable fuel program does not preempt the Blending Statute. The EPA anticipated that suppliers (i.e., refiners and importers) would often not be carrying out the blending themselves, but rather, would sell unblended gasoline to distributors who would then blend the gasoline with ethanol. That the suppliers may find themselves having to purchase RINs was fully anticipated by the agency charged with implementing

21

the renewable fuel program and militates in favor of a finding for the Defendants on this issue.

Moreover, we reiterate the presumption that Congress did not intent to preempt state law. Cf. Columbia Venture, 604 F.3d at 830. And Plaintiffs have identified no component of the federal renewable fuel program that is impeded by the Blending Statute. Plaintiffs' chief complaint is that the Blending Statute impedes the flexibility that Congress and the EPA intended to grant suppliers in determining how to meet their obligations under the federal renewable fuel program. But as the district court correctly observed, suppliers are essentially seeking to exclude retailers from participating in the process of ethanol blending, therefore creating a monopoly of RINs. As recounted above, the EPA clearly did not contemplate the RIN market developing in such a manner. Indeed, to the extent that the federal renewable fuel program is concerned with creating flexible systems for production of blended gasoline, the Blending Statute contributes to those ends by requiring suppliers to allow retailers to blend ethanol with conventional gasoline.

We therefore conclude that the Plaintiffs' contention that the federal renewable fuel program preempts the Blending Statute lacks merit. The district court did not err in granting summary judgment to the Defendants as to this issue.

22

### E.    Lanham Act Preemption

Plaintiffs' final argument for preemption is that the Blending Statute interferes with suppliers' ability to control the quality of the products bearing their trademarks. Such quality control by the mark holder, the Plaintiffs represent, is a fundamental premise of the Lanham Act and provides the basis for their preemption argument on the Blending Statute. The Plaintiffs do not contend that Congress, via the Lanham Act, has expressly preempted the Blending Statute. Rather, the Plaintiffs rely on "conflict preemption;" that is, whether the Blending Statute "actually conflicts with federal law," Cox, 112 F.3d at 154, or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Arizona, --- U.S. at ---, 132 S. Ct. at 2501.

As one court has explained, "the Lanham Act expresses a Congressional design to legislate so that the public can buy with confidence, and the trademark holder will not be pirated." Mariniello v. Shell Oil Co., 511 F.2d 853, 858 (3d Cir. 1975). In Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104 (4th Cir. 1991), we observed that "the Lanham . . . Act affords the trademark holder the right to control the quality of the goods manufactured and sold under its trademark. The actual quality of the goods is irrelevant; it is the control of the quality that a trademark holder is entitled to maintain." Id.

23

at 107 (internal quotation marks, alteration, and citation omitted).

In addition, one of the Lanham Act's purposes is "to establish uniform regulation of trademarks thereby eliminating the possibility that remedies would vary from state to state." Rickard v. Auto Publisher, Inc., 735 F.2d 450, 457 (11th Cir. 1984). The Lanham Act is intended to, inter alia, "protect registered marks used in [interstate] commerce from interference by State . . . legislation." 15 U.S.C. § 1127.

Two cases from this Court are particularly instructive in determining the application of the Lanham Act in the case at bar. Shell Oil, a trademark infringement case, informs our preemption analysis because it articulates the rights of a trademark owner to regulate the quality control of the petroleum products bearing its mark. In Shell Oil, a wholesaler of bulk oil (who was not authorized to sell Shell oil) bought Shell-brand oil from an authorized distributor and then resold it under the Shell trademark. 928 F.2d at 106. The wholesaler argued it was entitled to do so because the Lanham Act does not apply to the sale of genuine goods bearing genuine marks. Id. at 107. We disagreed, emphasizing that a trademarked good is only "genuine" if it is manufactured and distributed under quality controls established by that good's manufacturer. "Without Shell's enforcement of its quality controls, the bulk

24

oil sold by [the wholesaler] was not 'genuine.'" Id. Importantly, we underscored that the existence of quality controls on the part of the resaler were immaterial. "[I]n order to maintain the genuineness of the bulk oil, the quality standards must be controlled by Shell." Id. (emphasis added).

Furthermore, the Shell Oil court observed that, in the absence of quality controls as established by Shell, consumer confusion was likely, and the Lanham Act violated. "The use of the Shell mark implies that the product has been delivered according to all quality control guidelines enforced by the manufacturer." Id. at 108. "[P]roof of actual confusion is unnecessary; the likelihood of confusion is the determinative factor." Id. (quoting Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1185-86 (5th Cir. 1980).[8]

---

[8] Shell Oil's holding is consistent with that in United States v. Farmer, 370 F.3d 435 (4th Cir. 2004), a criminal trademark counterfeiting case. In Farmer, we upheld the criminal trademark conviction of a defendant accused of purchasing shirts manufactured for (but rejected by) mark holders, affixing the registered mark, and selling the shirts as genuine. We reasoned that, even if the quality of the shirts sold by the defendant was identical to the quality of "genuine" Nike shirts, "[o]ne of the rights that a trademark confers upon its owner is the right to control the quality of the goods manufactured and sold under that trademark." Id. at 441 (internal quotation marks omitted). Accordingly, "the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." Id. (internal quotation marks omitted).

25

Mobil Oil directly involved a claim of Lanham Act preemption as Mobil challenged Virginia laws regulating the maximum number of stations a retailer could operate, sales quotas for those stations, and minimum hours of operation. We acknowledged the settled principle that "[t]he Lanham Act gives a mark owner the right to control the quality of goods associated with his mark," 34 F.3d at 226, but held that the regulations at issue did not run afoul of the Lanham Act, id. at 226-27, under the facts of that case. Significantly, the challenged restrictions in Mobil Oil were entirely unrelated to the manufacture or preparation of the actual trademarked product, Mobil-branded gasoline.

With respect to the Virginia regulation that suppliers could not require retailers to be open twenty-four consecutive hours per day, we held that the provision "does not adversely affect the quality of services provided by Mobil service stations" because "the inability to require 24-hour operation does not detract from [Mobil's] trademark image." Id. at 226. We also held that the Virginia law prohibiting suppliers from limiting the number of stations a retailer could operate was not preempted because it "[did] not have a significant negative impact on Mobil's quality control efforts. This provision does not alter the franchisee's obligations to uphold Mobil's standards as set forth in the franchise agreement[.]" Id.

26

Lastly, we reasoned that the Virginia provision prohibiting gasoline purchase or sales quotas in franchise agreements was not preempted because the provision "[did] not prevent Mobil from maintaining the quality of its products and services. . . . [a]ll gasoline sold under the Mobile mark must comply with Mobil's quality standards." Id.

Although we did not find Lanham Act preemption applied in Mobil Oil, the basis of our decision was that the challenged restrictions did not have a "significant negative impact on" Mobil's ability to control the quality of its trademarked good, Mobil gasoline. See id. Read together, Mobil Oil and Shell Oil stand for the proposition that, under the Lanham Act, the mark holder has a right to maintain the quality of the goods bearing its mark, and when a state statute does not significantly interfere with that right, there is no preemption.

Applying that framework to the case at bar, we conclude that the district court erred by granting summary judgment in favor of Defendants because genuine issues of material fact remain in dispute. Specific to this case, the Plaintiffs' as-applied preemption challenge under the Lanham Act goes to the effect of splash blending by retailers on the Plaintiffs' trademark rights; i.e., the quality of the gasoline product sold under those trademarks when it is produced by the splash blending process. Plaintiffs contended before the district

27

court that splash blending is unreliable as compared to inline blending because of the potential for human error in the measuring, delivery, and mixing of the ethanol as part of that process. By contrast, they note that inline blending is computer-operated, and when errors do occur, they are quickly detected and the blended gasoline is not released for sale. Because of the difference in the production methods, Plaintiffs assert that splash blended gasoline that is improperly blended is more difficult to detect, and more costly to correct, and has a greater potential to harm the customer's vehicle; all to the potential detriment of the suppliers' marks.

In addition to tendering affidavits in support of these claims, Plaintiffs submitted anecdotal documentation of trademarked blended gasoline, sold as E-10, but being comprised of more or less than 10 percent ethanol. In sum, Plaintiffs presented competent evidence that splash blending could result in an inferior quality product that could harm vehicle engines or performance thereby denigrating the value of the trademarked goods and fostering consumer confusion. In response, the Defendants presented evidence contradicting some of the Plaintiffs' evidence.

The district court, however, did not view the factual dispute regarding the relative quality of blending practices to be a material one for summary judgment purposes. In awarding

28

summary judgment to the Defendants, the district court rejected Plaintiffs' arguments "that splash blending prevents them from effective quality control" because "the undisputed facts do not support that contention." (J.A. 519.) The district court concluded that the Blending Statute "as applied does not prevent suppliers from engaging in quality control of their trademarked branded products," (J.A. 518), and therefore "a dispute over the best blending practice does not create an issue of material fact to withstand summary judgment," (J.A. 520.)

Citing to several of the parties stipulations (¶¶ 86-121), the district court held that because problems can arise from both inline and splash blending, "blending is an imperfect process," and therefore, no genuine issue of material fact exists. (J.A. 519-20). The court relied heavily on ¶ 74 of the stipulations, which stated that:

> Suppliers have asked Marketers in North Carolina to sign splash blending agreements if those marketers wish to splash blend a Supplier's branded gasoline product with ethanol. In some cases, the splash blending agreements impose quality control measures for splash blending and statements that seek to limit the Supplier's liability for blending errors.

(J.A. 117.) This stipulation, however, does not establish as undisputed fact that splash blended gasoline sufficiently meets the quality control that suppliers require for the trademarked goods: the blended gasoline. There is no explanation in the record whether the "quality control measures" imposed by the

29

splash blending agreements are sufficient in fact to maintain the quality reasonably required by the trademark owner, or whether they are merely an effort to mitigate the effects of the Blending Statute by requiring that splash blending be conducted in the best way possible absent preemption. Further findings of fact are necessary to determine whether the quality controls, imposed at the insistence of suppliers, are sufficient to actually protect the quality of the trademarked gasoline.

The court was correct that problems may arise from both inline and splash blending. But the fact that the trademark owner's preferred method of quality control is imperfect does not mean that other, perhaps more flawed, quality control measures are sufficient to protect the trademark owners' interests in maintaining the quality of their marks and avoiding consumer confusion. If, as a factual matter, inline blending is generally more accurate, or less likely to result in sub-quality blended gasoline, suppliers may have a legitimate Lanham Act claim that the Blending Statute forces them to authorize retailers to downgrade their trademarked products in the splash blending process that results in fuel that is below the quality desired by the holder of the mark. Whether they in fact have such a claim depends on the answer to factual questions that were not resolved prior to the award of summary judgment.

30

The district court, however, concluded that the Blending Statute could be construed to avoid a conflict with Lanham Act principles. In the district court's view, suppliers could "set forth specific guidelines for blending and require random testing of the resulting blended gasoline." (J.A. 518.) And to deal with retailers who are unwilling to "follow [suppliers'] quality control procedures, suppliers may forbid the use of the trademarked name as to the subsequent sale of the blended gasoline and bring suit under the Lanham Act where such unauthorized use occurs." (J.A. 519.)

In reaching these conclusions, however, the district court failed to view the record evidence under the correct summary judgment standard, "taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012). Construing the record evidence in favor of the nonmovant, the Plaintiffs, the evidence does present a genuine disputed issue of material fact that does not permit the award of summary judgment in the current posture of the case.

If the Plaintiffs' evidence is proven at trial, there is a reasonable possibility that splash blending could have a "significant negative impact" on the gasoline product sold to the consumer. That effect, if significantly deleterious, could negatively affect the quality of the marked goods in a way that

31

after the fact quality control measures would be insufficient to safeguard and maintain the quality of the "trademarked, branded products." Further, if the Plaintiffs prevailed on this factual issue of scientific proof, then their Lanham Act rights may extend beyond the partial quality control measures articulated by the district court and may not be sufficiently protected by post hoc remedies after the inferior trademarked goods have been placed in the consumer market by virtue of a conflicting state statute.

If the Blending Statute effectively operates to authorize Lanham Act violations with a "significant negative impact" on the quality of the trademarked good, the fact that suppliers have a right of action against retailers in those circumstances may be insufficient to save the Blending Statute from preemption. See Cox, 112 F.3d at 154 (state law is preempted "to the extent that it actually conflicts with federal law"). Unlike the mark holder's requirements in Mobil Oil, the Plaintiffs' trademark complaints here go directly to the manufacture of the marked product, the blended gasoline, which goes directly to a consumer market. Without finding as a fact the effect of splash blending, the district court could only speculate as to whether splash blending had a "significant negative impact" and whether that impact would be, in fact, sufficiently eliminated by a realistic set of after-the-fact

32

quality control measures. Consequently, the district court could not have determined, without a factual resolution of the effect of splash blending, whether the mark holders' rights to quality control of the marked product were protected from "significant negative impact" and the likelihood of consumer confusion prevented.

Under the Shell Oil/Mobil Oil formulation, it is not enough to say, as the district court did, that some measure of quality control is available to suppliers. Rather, the court must make factual findings establishing whether or not the quality of gasoline that is splash blended by retailers meets the trademark holders' (the Plaintiffs) quality standards to be blended in the manner specified by the owner of the mark. If the splash-blended fuel is not to a quality as specified by the trademark owner then the district court should make further findings of fact whether, and to what extent, the suppliers could reasonably impose quality controls on splash blended gasoline, and the efficacy of those quality control measures to protect their trademarked goods and prevent consumer confusion. If the suppliers are, as a factual matter, able to demand that marketers take certain ameliorative steps that effectively mitigate material risks to quality that the district court finds are associated with splash blending, then the Blending Statute may not "have a significant negative impact on [suppliers']

33

quality control efforts." Mobil Oil, 34 F.3d at 226. In that circumstance, particularly in view of the presumption against preemption, a finding of preemption may not lie.

Defendants rejoin on appeal that the Blending Statute does not conflict with the objects of the Lanham Act because there is no evidence in the record of consumer confusion. Defendants may be correct as a matter of record, but the lack of evidence of actual existing consumer confusion is beside the point. As we observed above, "proof of actual confusion is unnecessary." Shell Oil, 928 F.2d at 108 (internal quotation marks and alteration omitted). The key question is whether consumer confusion is likely. See id. If the Plaintiffs' factual claims on inline blending versus splash blending are correct and other quality control measures are not sufficiently effective, then the district court must further weigh whether the sale of the potentially inferior product will be likely to cause consumer confusion. The suppliers' trademarks suggest to the consumer that the blended gasoline has been manufactured to a level of quality specified by the trademark holder. And if that is not so, the Lanham Act may be transgressed.[9]

---

[9] Plaintiffs also contend that the Blending Statute is contrary to the goals of the Lanham Act because it allows for a sort of "soft piracy" by permitting retailers to sell blended gasoline bearing suppliers' marks, when, in actuality, retailers have only purchased a percentage of the final product from (Continued)

Accordingly, we vacate the district court's grant of summary judgment to the Defendants on the Lanham Act preemption claim. We remand the case to the district court to consider upon further fact finding whether the Blending Statute, by preventing suppliers from restricting the ability of retailers to splash blend, has a "significant negative impact" on the suppliers' ability to ensure that blended gasoline bearing the suppliers' mark is at the level of quality suppliers reasonably demand to safeguard their trademark rights and prevent consumer confusion. In doing so, the court should be mindful both of the weighty presumption against preemption of state law, and also of the maxim that "the purpose of Congress is the ultimate touchstone in every pre-emption case." Wyeth, 555 U.S. at 565. Finally, we note that should the district court conclude suppliers cannot adequately ensure the quality of splash-blended gasoline, the Lanham Act would not preempt the Blending Statute in its entirety. Rather, any preemption under the Lanham Act would go to limiting North Carolina from requiring suppliers to

suppliers (ninety percent in the case of E-10 gasoline, for example). This argument lacks merit. As the district court recognized, suppliers set the price of ethanol, and can require retailers to disclose in advance of sale whether they intend to blend unblended gasoline with ethanol. Nothing in the Blending Statute prevents suppliers from adjusting their prices in order to ensure that they are compensated for the goodwill associated with the products bearing their trademarks.

permit the sale of splash-blended gasoline under their trademarks. See Dalton v. Little Rock Family Planning Servs., 516 U.S. 474, 476 (1996) ("[S]tate law is displaced only to the extent that it actually conflicts with federal law.") (internal quotation marks omitted).

## IV.

Although we are in agreement with the district court insofar as it rejected Plaintiffs' PMPA and federal renewable fuel program preemption challenges, we hold that genuine issues of material fact remain unresolved as to Plaintiffs' Lanham Act preemption challenge to the Blending Statute. As a consequence, the district court erred in awarding summary judgment to the Defendants on the Lanham Act claim. We therefore affirm the judgment of the district court in part, vacate it in part, and remand for further proceedings consistent with this opinion.


AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED